MARK BUTTERFIELD, Chief Judge.
PROCEDURAL HISTORY AND BACKGROUND
The case Coalition to Fair Government II v. Chloris A. Loire, et al, CV 96-22, was filed on May 7,1996. This case is a constitutional dispute where the plaintiff is seeking declaratory relief and invalidation of the actions taken at the General Council on April 27, 1996, at the Ho Chunk Bingo Hall. The Coalition action seeks to prevent the removal of legislators purportedly removed under Ho-Chunk Nation Constitution, Art. IX, § 1, as well as declare various other acts of the General Council null and void. No Answer had been filed on *148 May 14, 1996, the date of the expedited scheduling hearing.
On May 14, 1996 a similar action was filed by the HCN Legislature challenging actions taken at the April 27⅜ 1996 General Council, HCN Legislature v. Cloris A. Lowe, Jr. et al., CV 96-24. In Ho-Chunk Nation Legislature v. Chloris A. Lowe, Jr. et al, CV 96-24, the HCN Legislature is seeking declaratory and injunctive relief against an unlawful purported removal of members of the Legislature which occurred at the Ho-Chunk Nation Special General Council of April 27,1996.
The plaintiffs’ requests for a preliminary injunction enjoining the Special Election was broadly based and primarily sought to prevent the altering of the status quo. The focus of the preliminary injunction considered by the Court involved the proper construction of the section of the Constitution involving the ability of the General Council to remove Legislators under the HCN Constitution, Akt. IX, § 1, and establishing the existence of a quorum for which business could then be entertained. Resolution of the appropriate procedures and the guarantee of due process is an issue vital to the proper operation of the Ho-Chunk Nation government.
On May 21, 1996 the Trial Court issued an Order enjoining the HCN Election Board from calling and conducting a Special Election to replace those individual legislators allegedly removed on April 27, 1996 for 30 days. An appeal was immediately filed by the defendant appellant Whi-terabbit challenging the grant of injunctive relief. The Supreme Court accepted the appeal, Coalition For A Fair Government II, v. Chloris A. Lowe & Kathyleen Lone Tree Whiterabbit, SU 96-02 (HCN S.Ct. May 28, 1996), but did not issue a Stay of the trial court proceedings. During the pendency of the appeal, defendant Lowe on June 3, 1996, filed his Answer claiming immunity from suit, contending the actions of the April 27, 1996 General Council were not subject to judicial review, and that the Complaint failed to state a claim upon which relief could be granted. On June, 4, 1996, the co-defendant Election Board answered the Complaint claiming no direct interest in the action and seeking a declaration from the Court of its role as party in the proceeding. Defendant Whiterabbit filed an Answer to the Complaint on June 4, 1996, contending that the suit should be dismissed as a political question escaping court review, that immunity barred the suit, that the plaintiffs) failed to join indispensable parties, and that no case or controversy existed.
The case came before the Hon. Judge Butterfield for a Scheduling Hearing on June 27, 1996, as the Order enjoining the Special Election was pending on appeal and had expired of its own force during the pendency of the Appeal. This Court issued an Order July 1, 1996, preserving the status quo in CV 96-24, taking notice of the pending matter before the HCN Supreme Court in CV 96-22. The plaintiffs in Coalition, CV 96-22, moved to consolidate the cases orally.
This case was returned to this Court after remand from the HCN Supreme Court in Coalition for a Fair Government II v. Chloris A. Lowe Jr. and Kathyleen Lone Tree-Whiterabbit, SU-02 (HCN S.Ct. July 1, 1996). The HCN Supreme Court upheld this court’s grant of injunc-tive relief. This Court conducted a second scheduling hearing, and a hearing on the Motion to Consolidate on July 15, 1996. By Order dated July 31, 1996, the Court consolidated, the Coalition, CV 96-22 and HCN Legislature, CV 96-24, pursuant to HCN hit. R. Civ. P. 28(c). The Scheduling Order provided that discovery would conclude on August 16, 1996 with the ex *149 ception of depositions which would be completed by August 30,1996.
On September 3, 1996, the Court issued an Order seeking clarification from the parties on whether each attorney involved in the pending lawsuit was representing an official Ho-Chunk Nation entity had an BIA approved contract, and the effect on the 80/20 Proposal by the Proposed Rule-making of the Office of Indian Gaming, United State Department of Interior. The defendants verbally raised objections to these clarifications and no ruling was made on these issues. On September 3,1996 the Court issued an Order (Compelling Discovery), finding that the responses of the defendants Lowe and Whiterabbit were vague, and as to defendant Lowe evasive. The Court directed the parties to conduct a diligent inquiry and disclose the information requested.
On September 9, 1996, a last minute Motion to Recuse based on evidence known for at least a month and a half, was filed by defendant Lowe which was denied on the date of Trial. After delay, the trial went ahead as scheduled on September 11, 12 and 13, 1996. At the close of Trial, the parties requested an extended briefing schedule where the final reply brief would not be filed until October 23, 1996. Due to a delay in the delivery of the transcripts by the Court Reporter, an extension to file briefs was requested and granted so that the final reply brief was to be submitted November 5, 1996. Other than the injunction preventing a special election, this Court has not issued a decision regarding the merits of any other claim regarding the effect of the “80/20” proposal or other General Council Resolution purportedly enacted on April 27, 1996. This case is now ripe for a decision.
FINDINGS OF FACT
1. The General Council involved here was held April 27, 1996 at the Ho Chunk Bingo Hall on the trust lands of the Ho-Chunk Nation. Quorum was alleged to have been reached at 4:35 p.m.[1] Registration began at 9:30 a.m. See minutes of the General Council.
2. The actions of the General Council objected to, were the purported removal from office of James Green-deer, Area II, Mary Ann Yazzie, Area V, and Ona Garvin, Area IV. See Resolution of the General Council 4-27-96 C, D & E.
3. The results of the General Council were announced by causing a copy of the minutes to be served upon the Legislature sometime in May 1996. The exact date is unknown even after trial.
4. No General Council has reached and maintained a quorum except briefly in September 1994, until the actions of the General Council of April 27, 1996. No quorum was reached at a General Council on Saturday, April 20, 1996 in Black River Falls. According to the Ho-Chunk Wo-Lduk, Adam Hall, the Tribal Enrollment Officer reported *150 only 390 members registered. Ho-Chunk Wo-Lduk, April 26, 1996, Yol. X, Issue 13, p. 4. No quorum was reached at a General Council called for January 6, 1996 in La Crosse, WI. A brief quorum was reached at a General Council called for November 4, 1995 held in Madison, WI, but evaporated during discussion of a long term business plan. A brief quorum was reached for a General Council called September 9, 1995 at the Black River Falls, powwow grounds. A brief quorum was reached at a General Council held at the Lunda Center in Black River Falls, WI, in September 1994. A quorum was reached at a General Council in September 1993.
5. The General Council held on Saturday, September 24, 1994 at the Lunda Center in Black River Falls, Wisconsin resulted in no actions being taken. A quorum was not established. A total of 338 members attended the meeting with the WWBC. Ho-Chunk Wo-Lduk, Early October 1994, Vol. VIII, Issue 15, p. 1.
6. On November 4, 1995 a specially called General Council was held at the Expo Center in Madison, Wisconsin. The Ho-Chunk Wo-Lduk reported that this was the first General Council to reach a quorum since 1993. By noon on November 4, 1995, the General Council had 644 registered Ho-Chunk members. The last count issued at 2:20 p.m., there were 817 registered enrolled tribal members. Douglas Long was voted to be presiding officer and by 3:00 p.m. the agenda had been adopted. Quorum was lost during the discussion of the long term business plan. It is unknown whether any official business, other than procedural, was acted on. Ho-Chunk Wo-Lduk, November 10, 1995, Vol. IX, Issue 18. No minutes or other official records of this General Council was ever forwarded to the Court. It was stipulated that no minutes or other official records of this General Council exist.
7. The first General Council under the new HO-CHUNK NATION CONSTITUTION was held on Saturday, September 9, 1995 at the Black River Falls Pow-Wow Grounds. The General Council needed 634 members to attain quorum. No action was taken because quorum was not met as only 619 eligible Ho-Chunk members registered. Ho-Chunk Wo-Lduk, Early September 1995, Vol. IX, Issue 14, p. 3.
8. The General Council was held at the La Crosse Center on January 6, 1996. There were 514 Ho-Chunk members registered, but no quorum was reached. Ho-Chunk Wo-Lduk, January 12, 1996, Vol. X, Issue 2.
9. A General Council was called by the HCN Legislature on April 12, 1996 to be held on April 20,1996 at Black River Falls High School. See Ho-Chunk Wo-Lduk, April 12, 1996, Vol. X. Issue 12, p. 3. A meeting was convened but insufficient numbers of eligible voters signed in to constitute a quorum.
10. The General Council in September 1994 held at the Lunda Center in Black River Falls was adjourned shortly after quorum was reached because an insufficient number of Tribal members were present to ratify the minutes of the prior General Council. General Councils pri- or to November 1, 1994 only re *151 quired ten (10) % of the voting membership of the tribe to be in attendance.
11. The present HCN CONSTITUTION was enacted by special Secretarial Election on September 17, 1994 and approved by the Assistant Secretary of the Department of the Interior on November 1, 1994. The HCN CONSTITUTION requires that Twenty (20) percent of the eligible voters of the Nation be present for a quorum to conduct business of the Nation. See HCN Constitution, Art. IV, § 7.
12. No General Council has held quorum for more than an hour or so since the passage of the present HCN CONSTITUTION until the April 27, 1996 General Council.
13. On April 27, 1996 there were approximately 3,240 voting members of the Ho-Chunk Nation of whom 20% amounts to 648 members. Tr. I, p. 234.
14. The General Council Planning Committee (GCPC) is a body of Tribal members nominated by the local areas and appointed by the Legislature to serve as planners and organizers of General Councils called by any Constitutional body eligible to call a General Council. The GCPC is responsible for paying for the venue, or hall, where the meeting is to be held, providing for meals, and providing logistical back up for the General Council. See Affidavit of Ona Gamin dated May 16, 1996.
15. The GCPC was added as a party defendant by the HCN Legislature in their suit commenced May 14, 1996. Personal Service of the Summons and Complaint of CV 96-24 on the known Vice President of the GCPC, Shawnee Hunt was accomplished on May 21, 1996. See Affidavit of Metro Legal Semices Inc. Shawnee Hunt acted in an official capacity through much of the proceedings of the General Council of April 27, 1996, until Chloris A. Lowe Jr. was selected as the presiding officer.
16. The GCPC has no inherent authority, but possesses only that authority delegated to it by the Legislature, or by a duly constituted General Council, that is within the bounds of the General Council to give in accordance with the HCN CONSTITUTION. Tr. II, at 167-68 (Testimony of President Lowe); Tr. I, at 79-80 (Testimony of Ona Garvin).
17. A General Council may be called by the President of the Ho-Chunk Nation, upon a written request of a majority of the Legislature, and by 20% of the voting electorate of the Ho-Chunk people. If a meeting is called, the Constitution makes it a mandatory duty for the President to provide notice for all Special Meetings of the General Council, even those calling for his/her removal. HCN Constitution, Art. IV, § 7.
18. The Coalition filed its Complaint on May 7, 1996. On May 14, 1996, the Legislature filed a similar lawsuit challenging the actions taken by the General Council on April 27, 1996. A preliminary opinion in this case was issued on May 22, 1996. An Erratum was issued on May 31, 1996, and a corrected preliminary injunction opinion incox’porating the Erratum was issued July 23, 1996. The opinion is published in the In- *152 man Law EepoRtee at 23 ILR 6181 (HCN Tr. Ct. July 23, 15)96).
19. The plaintiff is an organization of Ho-Chunk Nation members. The stated Chairperson of the Coalition for Fair Government II is Christine Jendrisak of Madison, WI. She is a Tribal member from Area V. The stated Vice Chairperson of the Coalition for Fair Government II is Angelina Waege of Sparta, WI. She is a Tribal member from Area II.
20. The defendants are Chloris A. Lowe, Jr., the Chairperson of the General Council of April 27, 1996, and Kathyleen Lone Tree—Whiter-abbit. Mr. Lowe is also the President of the Ho-Chunk Nation. Ms. Whiterabbit is a tribal member from Denver, Colorado appointed to serve as the Secretary of the General Council of April 27, 1996.
21. The HCN Legislature joined this lawsuit on May 22, 1996 after filing a Complaint against Chairman Lowe, and Secretary Whiterabbit, and adding the HCN Election Board and the General Council Planning Committee as additional defendants.
22. The HCN Constitution, Art. IX, § 1 states, “The General Council may remove any member of the Legislature for malfeasance. No vote by the General Council to remove a member of the Legislature shall take place before such Legislator has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.” (Emphasis added).
23. The notice of removal of the three Legislators, James Greendeer, Ona Garvin and Mary Ann Yazzie was served in person only on Ona Gar-vin. This occurred late in the day on April 23, 1996. The Notice was given to Ona Garvin four days prior to the General Council. The Notice did not indicate any allegations of malfeasance. Tr. I, p. 82; Exhibit 9.
24. The notice served on Ona Garvin is identical to notices for James Greendeer and Mary Ann Yazzie. The notice was served by Sanford Decorah who served all Legislators in attendance at a regular HCN Legislative meeting on April 23, 1996, a Wednesday. No notice was actually delivered to either James Greendeer or Mary Ann Yazzie, both of whom were on excused leave of absence.
25. Mr. Sanford Decorah was stipulated to be a member of the GCPC. When confronted with the absence of James Greendeer and Mary Ann Yazzie, he sought advice from Sheila Corbine, HCN Dept, of Justice attorney, who suggested he serve John Espinosa, an attorney serving as Legislative Counsel. Mr. Espi-nosa testified that he works for the Legislature and Legislative subcommittees as a whole and does not represent any individual Legislators. Tr. I, p. 296.
26. Mr. Decorah then proceeded to serve the Notices intended for James Greendeer and Mary Ann Yazzie by giving a copy to John Espinosa. Prior to this happening, Mr. Espinosa informed Sanford Decorah that the mentioned Legislators were on leave and that he was not the proper person to serve. He suggested that Byron Thundercloud the Vice President was the proper man to serve the Notices on. Tr. I, p. 295-96. Sanford De-corah left the notices for Dallas *153 WhiteWing, Mary Ann Yazzie and James Greendeer with John Espi-nosa.
27. John Espinosa did not contact either Mr. Greendeer or Ms. Yazzie prior to April 27, 1996.
28. No proof is provided in the minutes of the General Council as to what notice was given to the members of the Legislature allegedly being removed prior to the votes on removal. None of the three Legislators was actually informed of the grounds for removal.
29. The minutes of the General Council do show that none of the three Legislators was present at the time the General Council voted to remove them for malfeasance. Discussion over whether to remove the Legislators did not occur. None of the alleged grounds of malfeasance were read to the members of the General Council. There was no discussion as to the meaning of the charges. There was no proof of service upon the removed Legislators.
30. The votes for removal were by voice vote or “acclimation.” It is not known if a proper quorum was present for the votes for removal, because the votes to remove are unverifiable.
31. The minutes of the recording Secretary of the General Council have not been ratified or otherwise approved in accordance with past procedures of the General Council. No motion is recorded stating that the requirement of waiving the ratification or approval of the minutes of the General Council was passed.
32. No formal procedures governing the conduct of the General Council were passed. The procedures of the CGPC passed out for the September 13, 1995 General Council were ignored.
33. The General Council was called for and registration opened at 9:00 a.m. Registration of duly enrolled tribal members •was handled by Adam Hall, Tribal Enrollment Officer since approximately 1985, and the Enrollment Office. Tr. I, p. 233. Badges to be worn around the neck were given to each registrant upon signing in. Id. at p. 235.
34. The information packets, including the General Council agenda and resolutions, intended for registering tribal members were delivered by John Steindorf, an assistant to President Lowe, after registration had begun, Tr. II, p. 225, along with plastic bracelets which are similar to hospital or water park bracelets. The first registrants did not received bracelets at registration. Tr. I, p. 222, 235.
35. The bracelets were distributed by John Steindorf and his assistants to early registrants who only received a badge to be worn around the neck. Tr. I, p. 236. Registrants were to receive both a badge and a bracelet. Id, As Mr. Hall did not give out the bracelets to the early registrants he was not sure who they went to. Id, p. 235-36.
36. The General Council began at approximately noon. A videotape of the General Council proceedings was made by the editor of the Ho-Chunk Wo-Lduk. The videotape began at approximately 12:01 p.m., and had a major gap from 2 p.m. to 4:35 p.m. during which a lengthy roll call vote was being taken. There is a numbering disparity in *154 the videotape which is imprinted with the time of events one hour earlier than the actual time.
37. After sufficient numbers of people registered, Adam Hall went to the front of the Bingo Hall to announce that a sufficient number of people had registered to constitute a quorum. Id. at p. 237-38. See also Def. Exhibit A (Adam Hall’s tally of registrants). The Videotape shows that the meeting was called to order by Shawnee Hunt of the CGPC at 12:01 p.m., (post noon).
38. Mr. Hall’s tally shows that 598 people had registered by 11:17 a.m., and that 690 persons had registered by 11:37 a.m.; 862 people had registered by 1:25 p.m.; and 911 total people had registered by 3:25 p m Mr. Hall listed a closing total of 936 but no time is given for that number. This tally shows that pri- or to the meeting being called to order between 696 (at 11:37 a.m.) and 862 people (at 1:25 p.m.) had registered for the General Council.
39. No roll call was used prior to the attempted election of a presiding officer. Tr. I, p. 240.
40. After a quorum was called by Shawnee Hunt, Richard Mann was nominated as the presiding officer and Loa Porter as Secretary by Vaughn Pettibone. The nomination was seconded by Angie Waege. There was a fair amount of commotion and shouting during this period.[2] Muriel Whiteeagle-Lee requested a parliamentarian, the Legislators and members of the GCPC to sit up front, which was related to the General Council members by Shawnee Hunt. VT al 12:02. This was resisted by Angie Waege who insisted there was already a motion on the floor and should only be done after a presiding officer was elected. Ms. Waege stated that the procedure should be to elect a presiding officer and recording secretary who would take roll to establish a quorum prior to actual business being discussed.[3]
41. Immediately after the commotion, Shawnee Hunt called for order and asked that the conflicting microphones be surrendered and that there should be a Sergeant at Arms. Ms. Waege than called for the Bear Clan, as traditional sergeant at arms, to come forward to keep order and for volunteers as well as those assigned to count votes to step forward. At this point, Mr. Hunt lost control of the proceedings, which was taken over by Ms. Waege.
42. Immediately after the nomination of Richard Mann there was a motion to close nominations which was quickly seconded and the question was called.
43. After the Bear Clan was called forward, Dennis Funmaker poured tobacco, explained the meaning of the tobacco ceremony. Herb Good-bear, a Bear Clan elder, gave an invocation in Ho-Chunk explaining that the Bear Clan were the traditional “Warukos” or policemen of *155 the tribe while 20 to 30 Bear clan members assembled in front.
44. After the Bear Clan took the stage, the meeting’s order was directed by Robert Funmaker, a Legislator from Area IV and a Bear Clan member, who summarized the motion to nominate Richard Mann and called for people to vote in favor by raising their hand.[4] Though primarily Bear clan members were counters, others such as Marlys Whiteeagle and non-bear clan volunteers also counted votes.
45. At 12:22 p.m., Robert Funmaker announced his belief that the League of Women Voters was not needed for the Ho-Chunk Nation to count votes. This was immediately followed by a shouting outburst by Kathyleen Lone Tree-Whiterabbit. Bear clan members including Helen Miner Miller, Joann Jones, Gail Funmaker, Gail White and an elder all sought to hear Kathyleen Whiterabbit’s concerns. While they were speaking to her, Robert Funmaker called for a recount or second count of the “yes” votes. Prior to this there was never a call for no votes. Id.
46. At 12:30 p.m., there was more shouting and a verbal call for the no votes by Robert Funmaker. The no vote count was then taken. At 12:35 p.m., there was a call for those abstaining. A shout came from the audience of “motion defeated” followed shortly by much commotion.
47. At 12:40 p.m., loud disruptive chanting began in the back of the Bingo Hall of “We want Chloris! We want Chloris!” Led by Kathy-leen Lone Tree—Whiterabbit.
48. At 12:41 p.m., Chloris A. Lowe Jr. approached the podium amidst clapping, shouts of approval and boos. Marlys Whiteeagle clapped and cheered for Mr. Lowe. Robert Funmaker appears to state “then we are out of here,” which is followed by a mass exodus of dozens, possibly hundreds of people at 12:42 p.m. It is impossible to estimate the number of people leaving, though a minimum of five rows of chairs in the front of at least fifteen to twenty chairs each are almost completely deserted. Most of the counters leave at this time. No vote total is ever announced on any of the votes for Richard Mann.
49. Mr. Gilman Lincoln took the microphone at 12:46 p.m., and stated that there is a quorum and pleads for family unity as a tribe. Later at the announced time of 12:55 p.m., VT at 11:48, Shawnee Hunt, Vice President of the GCPC, called the meeting back to order after the walkout.
50, Mr. Hunt then explained that the field for nominations would not be closed until after everyone can nominate a person for the chair of the meeting. A nomination was made for Chloris A. Lowe Jr. and seconded. A nomination was made and seconded for John Dahl. A third nomination was made for Carlos Nakai, also seconded. The nominations were then closed by motion and second. A voiee near' the chair stated that every motion *156 needed to have a quorum. VT at 12:51.
51. Mr. Hunt then called for counters to come forward. No roll call had established a quorum at this point. Mr. Hunt acknowledged that there was a large number of empty seats by asking people to come up and fill them.
52. Prior to the vote on nominations, Mr. Hunt did not explain the method of voting, but simply asked that those voting for Chloris raise their hands. Mr. Lincoln, Mr. Stephens and many of the vote totallers raised their hands.
53. Mr. Hunt called for the votes for John Dahl by raised hands and asked that people only vote for one. VT at 12:58 p.m. The videotape reveals that many of the deserted seats filled-up. Mr. Hunt then announced that quorum would be determined by the total vote east in the nomination vote.
54. It was announced the votes for Carlos Nakai would be taken. Mr. Hunt declared that the vote for Chloris A. Lowe was 413, that the vote for Carlos Nakai was five. VT at 1:03. Mr. Hunt ruled that establishing a chair was not an action of the General Council and does not need a Quorum. He states that determining the Chair is only for organizing and does not need a quorum. Then he asks for abstentions. VT at 1:06 p.m. Shawnee Hunt called for votes for those opposed to Chloris A. Lowe. VT at 1:10 p.m. Then he called for those opposed to John Dahl to raise their hands. Then Mr. Hunt called tor those opposed to Carlos Nakai.
55. Mr. Hunt stated that “we have a quorum. Cool!” After a short period of clapping, someone in the background asked, “who said we have quorum?” VT at 1:11 p.m. Shawnee Hunt then turned the meeting over to Chloris A. Lowe Jr. VT at 1:12 p.m.
56. Mr. Lowe then asked for the vote totals for the Chairman and that everything abide by the Constitution. All actions of the General Council must abide by the Constitution. That the I’s are dotted and the T’s are crossed. The totals were handed to Mr. Lowe by Alex Stephens. Mr. Lowe read the amount of total votes cast for Chairman as 682, including those for, against, plus abstentions. The individual numbers are not disclosed. Lowe then instructed the members that, “I want you to understand that we have to hold this quorum on each and every action that’s taken by the General Council. If at any point in time we lose that quorum then we can no longer proceed with any official actions. So understand that.” VT at 1:14 p.m.
57. Chloris took a nomination by Anita Mousseaux for Kathy Lone Tree-Whiterabbit for Secretary. A second was made by Lenora Smith. Chloris Lowe called to close the nominations. A motion was made by Anita Britten, seconded by Maria Contreras to close nominations. Mr. Lowe called for counters to count raised hand votes for the vote of Ms. Whiterabbit. Mr. Lowe stated the procedure was to put your hand down once you’ve been counted.
58. Lowe admonished the members. “You have to participate. If any of these votes falls before, or below *157 the requirement we cannot continue ” (emphasis added). He then ealled for a raised hand vote for those in favor. Lowe then followed by asking for opposed votes. VT at 1:24 p.m. Mr. Lowe then ealled for abstentions.
59. At 1:28 p.m., Mr. Lowe mentioned that many people were getting up and leaving. He announced the total votes cast was 446. Mr. Lowe stated, “This means we do not have a quorum.” Mr. Lowe continued the meeting despite the lack of a quorum. Mr. Lowe announced that no business could be conducted without a quorum.
60. Chloris Lowe claimed that approximately 136 people did not vote based on the difference between the vote for him and Ms. Lone Tree-Whiterabbit’s vote total. A motion was made for a recount. VT at 1:33 p.m. On a voiee vote, in which a majority endorsed a recount, Mr. Lowe went ahead with a recount despite loud and vociferous calls of “no quorum.” VT at 1:35 p.m. Mr. Lowe then announced that if no quorum was reached in the next ballot, he would call for a roll call. Those in favor were called to vote using the raised hand method of voting. Ona Garvin is clearly seen in the hall at this time, she spoke to Mr. Lowe at the podium and remained for a few minutes.[5]
61. Lowe called for opposed votes. VT at 1:42 p.m. Counting was altered to start at the back of the hall instead of the front as before. Votes were based on a raised hand vote. Lowe called for the abstention vote.[6] VT at 1:45 p.m.
62. Mr. Lowe announced the total of votes (for, against, and abstaining) cast was 581, nearly 65 short of a quorum. He suggested that more people were coming in to register, and did not vote in the last count. He then called for a roll call vote of anyone in the building at 1:48 p.m. He then asked for a roll call vote upon a voice vote endorsement of the members. A large voice vote affirmed this choice.
63. Mr. Lowe stated that, “this is the only way to address the situation to see if we have quorum.” VT at 1:49 p.m.
64. Mr. Lowe asked enrollment to bring the computer sheets forward and asked Lone Tree—Whiterabbit to come forward to assist him. He announced that the person answering the roll must raise their hand and call out “present.” At 1:54 p.m., the roll call began. Ms. Lone Tree—Whiterabbit then asked that the person state “Yes.” Alex Stephens assisted Ms. Lone Tree— Whiterabbit. He did not look up during this period because he is looking at the roll call sheet.
65. The videotape skips from 2:01 p.m., during roll call to 4:23 p.m. It may be that it was done to conserve the tape or the recorder’s battery during the long and repetitive roll call process, however, no testimonial evidence was submitted explaining the large gap.
*158 66. Mr. Hall observed that people left after answering the roll call and did not return. Tr. I, p. 243.
67. Mr. Lowe announced that events would recommence at 4:25 p.m. There is a unexplained gap in the tape from 4:30 to 4:33 p.m.
68. Mr. Lowe called the meeting back to order at 4:35 p.m. No vote was announced orally that a quorum had been reached. Mr. Lowe altered the procedure again to take the vote of Secretary by a voice vote because it only needed to be done by appointment.
69. A voice vote to appoint Kathyleen Lone Tree—Whiterabbit as Secretary of the General Council was passed shortly thereafter. At no time on the videotape or in the minutes of the General Council was there any reference to running the meeting in accordance with Rob-eet’s Rules Of Order. No other-procedures were suggested other than the one of allowing the traditional keepers of order, the Bear elan, to perform that function. After the rejection of Richard Mann as presiding officer, even that procedure was dispensed with.
70. After the appointment of Mrs. Whi-terabbit, the General Council moved to put the “80/20 plan” first on the General Council agenda. This motion was approved by voice vote.
71. After this action, Chloris Lowe, Jr. asked Steve Camden, position in the Executive branch unknown but a CPA and alleged expert in budgeting, to explain the “80/20” plan. This included a detailed budget, which more than setting a policy of 80/20 detailed to the penny, appropriations for each branch of government. This included a monthly payment of $1,187.08 per member beginning July 1 and a $5,000 immediate distribution of money to each member. During the explanation, Mr. Camden claimed that there would be adequate cash flow and no impact on the programs of the Tribe and the “operating expenses and revenues would still be in those areas.”
72. From 4:35 p.m. to 6:30 p.m., there was very little talking or disruption.
73. After Mr. Camden’s explanation, Chloris A. Lowe, Jr. called for a “raised hand” vote on the “80/20” resolution, 4/27/96-A. Chairman Lowe voted for the 80/20 plan. Mr. Lowe announced one section had to be recounted. VT at 5:04 p.m. This was the section opposite the entrance. Later, Mr. Lowe announced that another section had to be recounted. This was the section closest to the entrance. VT at 4:07 p.m.
74. During the majority of the tallying period both League of Women voters members including Diane Martin carefully observed the tallies. It can be observed from the videotape that they are not watching either the entrance from the parking lot or the entrance to the Casino at the back of the Hall.
75. Chloris A. Lowe again announced that the section closest the entrance had to be recounted. VT at 5:09 p.m. He claimed a “different count” after the recount of that section but he did not state what the two previous counts had been. At that time neither the Nays nor Abstentions had yet been counted.
*159 76. Chloris A. Lowe Jr. asked for a Nay vote. VT at 5:11 p.m.
77. Chloris A. Lowe Jr. asked for an Abstention vote. VT at 5:14 p.m.
78. The result of the “raised hand” vote on the “80/20” resolution including the recount of one section was announced as 534 votes for, 9 opposed and 16 abstaining for an announced total of 559, which Chloris A. Lowe, Jr. announced as less than a quorum. The count does not reach the 648 quorum requisite. VT at 5:20 p.m. This was 89 votes short of a quorum.
79. President Lowe then took suggestions from the floor, one of which was to count non-voters, another was to do a standing vote. VT at 5:22 p.m. A motion to do a recount was made followed by a second. Another suggestion was to have a “moving vote” being careful of children and elders, and moving to an area of the room. Another motion was made but not seconded to have the non-Ho-Chunks move to one side of the room. This was ruled out of order by Mr. Lowe because of the previous motion on the floor. Mr. Lowe then called for a voice vote for the recount by “standing.” VT at 5:24 p.m. The voice vote was declared carried by a majority of those present. Id.
80. Shortly afterwards, Kelly Decorah asked if a majority was present, “because I think more and more people are leaving. They are getting kind of tired sitting around here. And we are not really getting down to what we should be doing here.” VT at 5:25. In explaining the standing vote, Chloris A. Lowe stated that a suggestion for a movement “would cause way too much confusion” and a standing vote would be adequate. Id. at 5:26 p.m.
81. Mr. Decorah was then followed by Bill Winnesheik who questioned whether a voice vote could even be valid under the Constitution. VT at 5:26. Mr. Lowe denied that there would be a voice vote but that people would vote by standing. Those voting in favor of “80/20” would stand (with wheelchair' bound elders raising their hands). No procedure was announced how to differentiate those voting Nay and those Abstaining. The counting began.
82. During the count, Chloris A. Lowe Jr. told people by the entrance (on the wall to his left) to remain because, “we are having a problem getting an accurate count.” VT at 5:30 p.m.
83. During the period of counting the videotape focussed only on the podium where it is possible to see Diane Martin, Anita Mouseaux, Chloris A. Lowe, Jr. and other counters or tally workers, but not the actual counters. No result of the standing vote was announced.
84. At 5:36 p.m., Chloris A. Lowe, Jr. announced that there was wisdom in the suggestion to move people around. No motion was made for a recount, since no result of the “standing count” was publicly announced. Chairman Lowe announced that people should immediately do a standing count or “moving eount” whereby voters assembled in different quarters of the Bingo Hall. One area for yes on 80/20, another for no and another for abstaining. Mi-. Lowe announced, “I know this is ludicrous, *160 but we have to do this at this point.” VT at 5:36 p.m. Later there was appended an accommodation for elders to raise their hands. VT at 5:39 p.m. No provision was made to differentiate between an elder for, opposed, or abstaining on the 80/20 vote.
85. At one point, elders for the plan were asked to raise their hands, but not for those opposed or abstaining.
86. Apparently counters were asked to count those “moved” into abstaining and opposed prior to those for the plan. VT at 5:42 p.m.
87. The voters assembled to Lowe’s right or Casino side, the pro “80/20” voters, were then counted by apparently walking through a “gate” of two vote counters and then sitting down elsewhere in the Hall. The counters were told to count themselves if they were tribal members. VT at 5:48 p.m. At this point the focus of the tape is on the audience and not the podium.
88. The vote on the move around vote was announced as: 22 Abstaining, 32 Against, and 665 for “80/20.” Loud cheers accompanied the announcement. Marlys Whiteeagle is seen clapping, as is Alex Stephens. VT at 5:55 p.m.
89. Chairman Lowe went on with the other agenda items. Mr. Lowe then mentioned that Recall was more appropriate as a point of law than removal. Chairman Lowe mentioned that the General Council would have a hard time sustaining removal of Legislators and that it would be better to put up candidates against the Legislators objected to in a recall election than trying to remove them. VT at 5:59 p.m.
90. Chairman Lowe explained that there is a 30 to 90 day period relating to removals and special elections, that the Constitution provided only for the removal of up to three persons at a time, and then attempted to explain the distinction between recall and removal, and to explain a recall. VT at 6:02 p.m.
91. At 6:03 p.m., Mr. Lowe asked for veto power for himself as President, with a two week override period for the Legislature. Mr. Lowe stated that the Resolution for veto power was in the packet.
92. Despite this recommendation, Libby Fairchild moved for the removal of Mary Ann Yazzie of Area V, which was seconded by Marlys Whiteeagle. The motion for removal does not allege malfeasance, nor were any charges of malfeasance stated. The word malfeasance was never used in the motion for removal. An immediate vote was called. VT at 6:05 p.m. Lowe then explained that removal was only allowed for “malfeasance” and inquired had the charges been delivered and had the individual been given adequate time to respond to the charges.
93. Lowe then asked for suggestions on how to vote, “do we have to move people around?” after hearing one or two shouted “No’s” Lowe immediately went to a voice vote abandoning the previous method of moving around. No provision was made for anyone to speak up for the Legislators. The charges of malfeasance were not read aloud, indeed, Mr. Lowe failed to ask if anyone wished to defend Ms. Yaz- *161 zie. No reference was made to any resolution in the packets, nor was the resolution read to the assembly. The voice vote was in favor, though some noise which may have been opposition was heard in the back.[7] The recorded vote indicated no opposition.
94. A motion was made to remove James Greendeer by Donna Hanson and seconded by David Deere. Mr. Lowe did ask for discussion. “Discussion?” No reference was made to any resolution in the packets, nor was the resolution read aloud to the assembly. Lowe then personally called the question. There was no charge of malfeasance. This was followed by a voice vote in favor of removal.
95. Lenore Smith then moved to remove Ona Garvin, this was seconded by Mara Whiteeagle, Tribal Id # 4542. There was no charge of malfeasance. Lowe asked, “further discussion,” then again personally called the question. No reference was made to any resolution in the packets, nor was the resolution read to the assembly. The voice vote was in favor, though some noise which may have been opposition was heard in the back. The recorded vote indicated no nays.
96. Marlys Whiteeagle then moved for special election to replace the “removed” Legislators. Ms. Mous-seaux then moved for the removal of Tracy Thundercloud and was ruled out of order. The Special Election motion was seconded by Maria Contreras. Marlys Whiteea-gle then moved to amend the motion for the special election in 30 days, if acceptable to the seconder. Lowe then summarized the motion to have the election occur “by the Constitution.” Lowe then called the question and called for the ayes, which was in favor.
97. Someone then moved for Legal counsel to defend the actions done, Ms. Contreras seconded and Lowe again called the question. It passed.
98. Terry Steindorf then moved to remove Roger Littlegeorge from the Election Board. Anita Britten proposed code of ethics on the agenda.[8] Nettie Kingsley proposed to place 4/27/96-B on the agenda. Lowe declared it already on the proposed agenda. No second. A call was made by Lowe for any other agenda items. Maria Contreras, Area V, moved to close the agenda to new items. Muriel Whi-teeagle-Lee, Tribal Id # 2556, seconded the motion. VT at 6:18 p.m.
99. Lowe then summarized the agenda as, Removal of Roger Littlegeorge, a Code of Ethics and Yeto Power. Anita Britten made a motion to adopt the agenda, seconded by Jerry Greengrass. Lowe then simply went straight to a voice vote without calling the question. It was approved.
100. Lowe then brought up the Roger Littlegeorge issue. The video tape is garbled for a few minutes, Anita Mousseaux seconded and *162 Lowe called the question himself. The motion was approved.
101. A Code of Ethics motion was called up. Anita Britten moved for a Code of Ethics which is enforceable, Dollie Bigjohn seconded. Lowe called the question himself and the voice vote was in favor. VT at 6:24 p.m.
102. The President then brought up the Veto power resolution in the packet. He read the “whereas section” to the assembly. VT at 6: 25 p.m. 4/27/96-B. Nettie Kin-glsey moved it was seconded by Teala Edwards and Lowe called the question.
103. Marguerite Whiteeagle moved the agenda to give $500 per person attending the meeting. Anna Thompson Atwater seconded. Lowe called the question which indicated a close voice vote. Lowe then called for the vote counters to come forward. A point of discussion Rose Marie Ostriech suggested that many people had left and that we were getting pretty greedy and it should be left aside. John Dahl mentioned that by not allowing money to all members it was doing what they accused the Legislators of doing. Marguerite Whiteeagle then rescinded the motion for the $500.
104. The agenda having been completed, Lowe asked for a motion to adjourn. Anita Britten made a motion that Area V be given a fourth legislator. Lowe then ignored Ms. Britten’s motion and entertained only a motion to adjourn. George Garvin seconded. Libby Fairchild called the question. The voice vote was in favor, though nays were heard on the video tape and the meeting adjourned. The tape then ends at 6:37 p.m.
105. Notice of a Special Election was placed in the Ho-Chunk Wo-Lduk, the official paper of the Ho-Chunk Nation in its May 4, 1996 issue, Volume X, Issue 14 on page 5.
106. No notice of official openings for the three allegedly “open” positions was ever posted in the Ho-Chunk Wo-Lduk. No cut off date was officially announced in the Wo-Lduk for anyone to file for office.
DECISION
This is a case of paramount importance to the separation of powers within the Ho-Chunk government and the checks and balances built into the Ho-Chunk Nation Constitution. On the one hand are a group of concerned Ho-Chunk citizens and the Ho-Chunk Nation Legislature and on the other are the representatives of the Ho-Chunk Nation General Council of April 27, 1996, one of whom is also the President of the Ho-Chunk Nation and the head of the Executive branch of government. Each in turn is requesting relief, or a declaration of rights from the Ho-Chunk Nation Judiciary.
The General Council of April 27, 1996 was called by Chloris A. Lowe Jr., in his capacity as President and head of the Executive branch of the Ho-Chunk Nation. In his call for a General Council, Mr. Lowe listed some items on his agenda to be discussed at that General Council. However, Mr. Lowe could not recall which items he had placed on the agenda. Tr. II, p. 188-89. Mr. Lowe claims to have been unaware of where many agenda items listed, on Exhibit 1, came from or who sponsored them. Of great importance *163 in the context of this case is the attempted removal of three HCN Legislators, Ona Garvin, Mary Ann Yazzie and James Greendeer, and whether a quorum existed during the meeting.
DISCUSSION OF THE CASE
I. THE NOTICES SERVED UPON THE LEGISLATORS WERE WITHOUT AUTHORITY, WERE LEGALLY DEFICIENT, VIOLATED THE LEGISLATOR’S DUE PROCESS RIGHTS AND WERE IMPROPERLY SERVED.
A core issue in this case is whether the alleged removal of three Legislators of the Ho-Chunk Nation was accomplished in a Constitutional manner. This Court indicated in a preliminary opinion that the plaintiffs were likely to succeed on the merits of this issue. Coalition for Fair Government II. v. Lowe & Whiterabbit, CV 96-22, p. 15-18 (HCN Tr. Ct. July 3, 1996). The reasons were that the Notices likely lacked authority, the Notices lacked any specific charges sufficient to allow a target of the notice to prepare a meaningful defense; that they were improperly served or were deficient in the manner of service of process. This Court, after having gathered the facts and having allowed the proponent of this method of removal to present its best case, now makes final its determination that the evidence supports the preliminary findings of the Court.
A. The Notices were Prepared without any Authority
First and foremost, the Notices were deficient because they were prepared and served by people without any authority to prepare and serve such notices. The General Council has never given the authority to issue charges of malfeasance to the GCPC. Tr. II, p. 167-68 (Testimony of Lowe). The Notices were apparently prepared by the General Council Planning Committee [GCPC], on April 23, 1996 although the conscious absence of the GCPC makes it impossible to determine this with certainty.
The GCPC is a committee of Tribal members who serve in a capacity to assist the operation of the General Council by among other things, securing the site, arranging for meals, ceremonial openings and payments of costs associated with holding the General Council and setting a proposed agenda. The GCPC exists through a delegation of authority from the HCN Legislature and has no independent authority that has not been delegated to it from either the Legislature or a General Council itself. See HCN Constitution Art. IV, § 2 (Delegations of authority from General Council to Executive, Legislative and Judiciary Branch, no delegation to GCPC); Tr. I, p. 79, 81 (Testimony of Ona Garvin) (no delegation from the HCN Legislature to the GCPC). The General Council retains the power to establish its owm procedures in accordance with the Constitution. HCN Constitution Art. IV, § 3(d). No minutes or official actions of any General Council were ever produced showing a delegation of authority to the GCPC or to the server of the Notices, Sanford Decorah, despite the self serving announcement of that fact by the drafters of the Notice itself.[9]
Sanford Decorah and Wayne Funmaker were members of the GCPC. They delivered the Notices to Ona Garvin and in the *164 absence of James Greendeer and Mary Ann Yazzie, to Legislative Counsel John Espinosa, However, no resolution with recorded votes or other indication that the GCPC officially sanctioned the notices to ten of the HCN Legislators was ever produced. Thus, even if the GCPC had authority to issue the notices in question, there is no indication the Notices given here were officially sanctioned or authorized by anyone on the GCPC. The reason for requiring official action or sanctions should be obvious. That is because only the General Council itself, and no individual members acting on their own initiative, may remove any member of the Legislature for malfeasance. See HCN Constitution ART. IX, § 1. No where in the General Council Removal of Legislators section of the Constitution, see id., is there any delegation to the GCPC. As the Constitution is silent on a delegation of authority and no evidence was produced throughout the three day trial showing a delegation of authority, the Court holds that the Notices issued were without authority. The GCPC is not the General Council, even though its purpose is to plan for a General Council, and even though it is entirely composed of persons eligible to attend a General Council. It is a mere planning body which has no known physical location, phone number or set time or hours where it might be contacted. See Notice of April 23, 1996, “[W]e, the General Council, are commencing action to remove you as a member of the Legislator of the Ho-Chunk Nation at the April 27, 1996 General Council for malfeasance.” This is a naked unilateral usurpation of power possessed by the Ho-Chunk eligible voters as a whole and is without support in the HCN Constitution.
The known Vice President of the GCPC, Shawnee Hunt, was personally served with the Simmons and. Complaint at his home in Minneapolis on May 20, 1996. It was contended by Ms. Whiterab-bit’s counsel that this was not effective Tr. II, p. 261, because the GCPC allegedly voted Mr. Hunt off on May 18, 1996, according to some GCPC minutes which he did not offer into evidence. This action appears not to have been published nor other notice given to any person attempting to deal with the elusive body known as the GCPC.
Since the members of the GCPC are selected by the membership from their areas and has no known bylaws or other operating procedures, such a removal unless published in the Wo-Lduk or publicly posted cannot have any legal effect. The other known officer of the GCPC, Don Blackhawk resigned prior to the April 27, 1996 General Council. Thus, the only known officer of the GCPC was Shawnee Hunt. The Court finds that the General Council Planing Committee was properly served in this case. Since the GCPC did not defend, the Court grants a default judgement against it specifically finding that its attempted notice to the Legislators is improper as alleged.
The HCN CONSTITUTION ART. IX, § 1, i.e., removal of Legislators by the General Council, operates, despite this limitation. Its objective can be accomplished by two means. First the General Council upon establishing a quorum can authorize a body or party of delegated officials to draw up the notice of malfeasance for a later General Council, or secondly it can draw up the notice itself and set a call after a reasonable time for the Legislators to return and defend themselves against charges of malfeasance at a subsequent General Council.
B. The Notices were Deficient
As outlined in this Courts previous opinion of July 23, 1996 the Notices given to the Legislators were defective in that no *165 notice advised the Legislators of the violations of malfeasance the Legislators were accused of, even in broad terms sufficient to given any one of them the ability to respond in a meaningful way. See Coalition v. Lowe and Whiterabbit, CV 96-22 at 15-17 (HCN Tr. Ct. July 23, 1996). The Notices stated:
Dear Legislator: _:
You are hereby directed to attend the President’s Call to the General Council. General Council of the Ho-Chunk Nation is scheduled to be held Saturday, April 27, 1996, at Ho-Chunk Casino, located at S3114 Highway 12 of Baraboo, Wisconsin.
According to the proposed agenda of the upcoming General Council for April 27, 1996, we feel it is in the best interest of our Nation’s people to further pursue our right to remove members of the Legislature.
According to our Constitution of the Ho-Chunk Nation, Article IX-Removal, Recall and Vacancies, Section 1. General Council Removal of Legislators, we, the General Council are commencing action to remove you as a member of the Legislature of the Ho-Chunk Nation at General Council of April 27, 1996 for malfeasance.
Legislator_, this letter serves as reasonable notice of the impending action.
Upon quorum assembly of the General Council, you will be given a reasonable opportunity to be heard.
If you have would like [sic] further information feel free to discuss this matter with any or all of the members of the General Council Planning Committee.
Plaintiff 2-Exhibits 2, 3 and 9.
The letter was closed, “As directed by the General Council Planning Committee.” It is urged by defendant Whiterabbit that specific notice to a alleged malfeasant Legislator of what they had allegedly done wrong is “irrelevant.” Whiterabbit Brief at 10. Indeed, defendant Whiterabbit would sweepingly read nearly all due process protections out of the Ho-Chunk Constitution under the rather dismissive statement that “traditional notions of due process do not directly apply to this case.” Whiterabbit Reply Brief at 3. Such an expansive statement is supported by only the general proposition the Ho-Chunk Constitution may be read differently than the U.S. Constitution. Therefore it is necessary to examine the HCN Constitution.
The portion of the HCN CONSTITUTION considered is ART. IX, § 1 which reads in its entirety: Section 1. General Council Rem,oval of Legislators. The General Council may remove any member of the Legislature for malfeasance. No vote by the General Council to remove a member of the Legislature shall take place before such Legislator has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.
HCN Constitution, Art. IX, § 1. What is apparent is that the GCPC, which is the self declared author of the Notices to Legislators, engaged in a process designed to be unfair. The Notices state that the Legislator must come to the GCPC to find out what “this matter” was about. This is not due process as contended by defendant Whiterabbit even liberally reading Art. IX, § 1.
The problem begins with the fact that the GCPC was a committee of tribal members :without any inherent authority to issue such a notice. See LA infra. To read their power so expansively would create a “fifth” uneleeted branch of government unaccountable to anyone but themselves, which could use the threat of *166 removal to bring any President, Legislator or Judge or Justice to do their bidding. This is not only anti-democratic in the extreme, but nowhere provided for in the structure of the HCN Constitution. Indeed, reading the HCN Constitution with a knowledge of the recent Ho-Chunk history during which it was enacted leads to the unmistakable conclusion that the procedural protections put into the new HCN Constitution as opposed to the old Wisconsin Winnebago Nation Constitution were designed specifically to prevent arbitrary and capricious actions on the part of all branches of government including voluntary or appointed committees.
Supposedly the GCPC knew what the allegations of malfeasance against the accused Legislators were but refused to release the specific details to those charged, instead putting the burden on the Legislators to seek the GCPC out. Only the most narrow and cramped reading of the Constitution could tolerate such a practice, which coupled with the lack of actual notice would virtually eviscerate, or gut, all of the carefully crafted protections of due pi’ocess out of the HCN Constitution. The safeguard against such an abuse of power is to require that normal principles of due process be observed. This also comports with traditional Ho-Chunk notions of respect by one Ho-Chunk toward another.
One of the most important of these due process protections in Constitutional jurisprudence is the right to notice which provides the recipient with sufficient information to mount a meaningful defense. There is no question this was not in the Notice actually prepared for the Legislators. However, contrasted with the Notice of alleged malfeasance are the General Council Resolutions to remove the three Legislators. These are specific and included an array of charges: Voting against executive branch initiatives [10] or going to Court to get a declaratory judgement of where the boundaries of separation of powers existed (i.e., through majority vote and trivial court actions);[11] refusing to recognize any actions allegedly taken at the November 4, 1995 General Council;[12] Failing to confirm an executive director without good cause; insufficient notice to members of the Nation of a General Council; calling a General Council on April 10 for April 20, 1996; failing to have the President call the General Council of April 20 [13] or the GCPC call it;[14] failing to fund *167 §the GCPC; misappropriation of funds by calling a General Council at Black River Falls to fund an event at Black River Falls High School; to Ms. Yazzie “lying to constituents.” [15] See Plaintiff 2 Exhibit 1 (Removal of Legislators). Moreover, the charges were known prior to the Notice of April 23, 1996. It appears that the failure to include the charges until disclosed in packets that were supposed to be distributed to every member in attendance was deliberate. Had the Legislators had these specifics, they could have mounted a defense. Without such specifics notice was inadequate.
The removal of a Legislator, or other official such as a President or Judge, is a grave act of the body politic of the Ho-Chunk Nation and must be done honoring not only the letter but spirit of the HCN Constitution which is designed to prevent arbitrary and capricious actions. The HCN Bill of Rights guarantees to every person within the Nation’s jurisdiction that the Ho-Chunk Nation “in exercising its powers of self-government shall not: deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without the due process of law.” HCN Constitution, Aet. X, § 1(a)(8). Legislators, no matter how misguided, or perceived to be mis-guided, are still afforded these protections, as is every Ho-Chunk citizen.
The U.S. Supreme Court has held that the interest which a public employee has in his job is property within the meaning of the Fifth and Fourteenth Amendments if he can be fired only for misconduct. If he has tenure in this sense, and therefore a property interest in his job, he cannot be fired constitutionally unless he is give the rudiments of fair procedure. See Jungels v. Pierce, 825 F.2d 1127, (7th Cir.1987); See also, E.g. Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 538-41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). This Court holds that Legislators have a liberty or property interest in their office pursuant to the removal section of the HCN CONSTITUTION, ART. IX, § 1, which provides them the right to continuation in their job absent malfeasance and recall. See Gordon v. Leatherman, 450 F.2d 562, 565 (5th Cir.1971)(public official found to have property interest in job).
Defendant Whiterabbit argues that the due process standards should not be strictly applied because the General Council is “the supreme branch of government.” (No citation to authority). While admittedly the General Council is the derivation of power in the Constitution, the General Council as an assembly of 20% or more of eligible Ho-Chunk voters is bound by the HCN Constitution, which “shall be the supreme law over all the territory and person within the jurisdiction of the Ho-Chunk Nation.” HCN Constitution, Art. Ill, § 4. It is also something the President *168 well knew when he warned members at the General Council that recall was a more appropriate method of dealing with Legislators the members had difficulty with. Tr. II, p. 166, VT at 5:02 p.m. Even General Council members with all of their passions aimed at one goal must abide by the limits they enacted by passing the present Constitution.
 One of the most important limitations is due process of law. Due process entitles Legislators to notice of the general charges of malfeasance for which their removal is sought.[16] This is in accord with the other actions by tribal agencies which suspended employees without pay and without specific notice of what they were accused of doing wrong. See Babcock v. HC Gaming Commission, CV95-07 (HCN Tr. Ct. Feb. 5, 1996); Cholka v. HC Gaming Commission, CV 95-67 (HCN Tr. Ct. Feb. 5,1996); White v. Dept. of Personnel, Ho-Chunk Nation, CV 95-17 (HCN Tr. Ct. Oct. 14, 1996)(employee terminable only for cause has property interest in job). The simple unadorned claim that “we are commencing action to remove you as a Legislator for malfeasance” is insufficient to meet that requirement.[17]
Defendant Whiterabbit argued that the actions of the General Council must bear a strong presumption of validity. The problem with this is that the history of Ho-Chunk General Councils in the past and under the new HCN CONSTITUTION have been so tumultuous and contentious that no procedures were ever adopted and even those suggested by the GCPC in May 1995 were ignored. Indeed, one of the complaints about the General Council not being properly funded is in part due to alleged votes not to allow the General Council or GCPC its own budget in the November 4, 1995 General Council. To be granted a presumption of validity, a body politic must follow procedural guidelines which are easily understandable and subject to verification. It is not necessary that they be the same each time, but that the procedures be clear and hopefully have some ability to be easily verified. As conceded by all parties at the onset of the Trial in September there are apparently no records, or official or quasi-official actions of any past General Council in the last year or even since 1993, despite the fact that there were four General Councils called. Three were called by the defendant Chloris A. Lowe, Jr. and one by the *169 plaintiff Legislature. Moreover, the procedures of the General Council of April 27, 1996 was so fraught with miscues and difficulties that even the proponents conceded that portions of the meeting lacked any procedural regularity. Response Brief of Whiterabbit at 14.
C. The Service of Process Upon the Legislators of Removal Notices was Deficient and Insufficient as a Matter of Law.
The Removal section of the HCN Constitution requires that “no vote may take place before such Legislator has been given reasonable notice of the impending action ...” See HCN Constitution, Art. IX, § 1. The Notices given here were actually served only on one Legislator sought to be removed, Ona Garvin. She received notice on April 23, 1996 prior to the April 27, 1996 General Council. Notice of three working days coupled with the lack of specifics to what alleged malfeasance she was alleged to have committed is too little time to be prepared. In Stands Over Bull v. Bureau of Indian Affairs, the Tribal Chairman being removed from office was given twelve days, was able to print a response to the charges in the tribal newspaper, and given “all the time in the world” to respond to the charge he had known for twelve days. 442 F.Supp. 360 (D.Mont.1977).
It is conceded by defendant Whiterabbit that neither Mary Ann Yazzie nor James Greendeer were actually served by Sanford Decorah. Both were on excused leave on April 23, 1996 at the HCN Legislative meeting that date as was Dallas Whitewing. Instead, defendant Whiterab-bit argues that due process does not require actual service on the absent Legislators. Whiterabbit Brief at 12. Instead, she argues that Notice was proper because service was made upon John Espinosa, a lawyer who selves as Legislative Counsel.
As this Court stated in it preliminary opinion of this case, the actions complained of are personal to the Legislators who are sought to be removed. See Coalition v. Lowe & Whiterabbit, CV 96-22 p. 16 nn. 3 (HCN Tr. Ct. July 23, 1996). The service of process by Mr. Decorah, who had no appointed authority from the General Council, on John Espinosa was not effective because Mr. Espinosa, unlike a person at the residence of an individual being sued, has no statutory or legal authority to accept service of process on behalf of individual legislators. He is not an officer of the Legislature but an employee who can only carry out directives of the Legislature or a Legislative subcommittee. He represents the entire Legislature, not individuals of whom it is comprised. The defendants have failed to show that the attorney here was authorized as an agent for service of process. See Schultz v. Schultz, 436 F.2d 635 (7th Cir.1971) (Wisconsin case where service improper on attorney not authorized to receive service for client).
“One of the most fundamental requirements of due process is that an individual must receive adequate notice of the claims being asserted against him.” U.S. v. Baker, 807 F.2d 1315 (6th Cir.1986). Furthermore, the U.S. Supreme Court has held that, “[t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and the opportunity to meet it.” Mathews v. Eldridge, 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) quoting, Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 171-72, 71 S.Ct. 624, 95 L.Ed. 817 (1950). This is precisely the flexible type of due process urged by defendant Whiterabbit. Once the person has proper notice, then they are given the *170 opportunity to meet it, though not necessarily with witnesses or documentary proof as urged by the plaintiff HCN Legislature.
The danger of improper service of process upon a person vitally concerned is manifest in this case. Mary Ann Yazzie was on approved leave prior to April 23, 1996, during and after the April 27, 1996 General Council. Tr. I, p. 52. Even had Mr. Espinosa tried to contact her, she was on a reservation in the Southwest United States visiting her mother-in-law whose residence lacked even a phone. Tr. I, p. 60. She did not return to find out what had happened until April 29,1996.
Mr. Greendeer was also on vacation and never was served, even when attending the April 27, 1996 General Council. Instructively, the HCN Supreme Court reversed the grant of a default judgement where the party was not personally served but was served by mail. June v. Doornbos & HCN Dept of Administration, SU 96-03 (HCN Sup.Ct. Oct. 15, 1996). Moreover, HCN Int. R. Civ. P. 5.D. requires that the Court may authorize other persons to serve process when there is an assurance the other person knows how to effect proper service and will make adequate factual inquires to assure that service is proper. Mr. Decorah did not know how to proceed when confronted with the absence of the three Legislators who were on approved leave. He did not serve the absent Legislators at their homes but instead tried the more expedient method of constructive service on someone not authorized to receive it, after being told the Legislators were on leave.
Wisconsin state law differs markedly from the Colorado law cited to the Court by defendant Whiterabbit. Pursuant to Wisconsin law, service against a natural person can be effected by personally serving the summons on the defendant either within or without the slate. § 801.11(l)(a) Wis. Stats. If the person cannot be located, service is permitted, “if with reasonable diligence the defendant cannot be served under par. (a), then by leaving a copy of the summons at the defendant’s usual place of abode.” § 801.11(l)(b) Wis. Stats. This was not service upon the Legislature as a whole but only against individual members so that corporate service rules do not apply. Service upon a person at their place of abode, even when left with a competent member of the family above the age of 14 who is informed of the contents of the complaint being served, assures that the complaint is served upon someone who is certain to bring it to the attention of the person sought to be served. § 801.11(l)(b)(l) Wis. Stats. No such attempt at service was made in this case.
Proper service and an adequate time to respond are especially important when the contents of the alleged removal resolutions are examined in detail. The punishment was not just removal, which the Legislators were notified of, but an apparent banishment from “any of the Ho-Chunk Nation offices specifically the Executive Office Building;” and a ban on a lifetime of holding Ho-Chunk public office. To the extent the General Council acted to exceed the punishment listed in the Notice given the three individual Legislators, it clearly violated the individual Legislator’s Constitutional due process rights. By going so far the General Council resolutions infringed upon the individual Legislator’s liberty interests by banning them from seeking service from them own government in the future. No one can seriously contend that the Legislator’s knew that this was intended by the vague notice they received or which they were intended to receive. In so holding, the Court upholds the principle that Legislators may be removed from office after proper notice *171 and at least a general list of their alleged malfeasance is given them with sufficient time to prepare a defense.
Nor were the charges read out loud so that the Legislators or the people to whom the vote was proposed could properly vote even on the notice in the packet.[18] The actual removal resolutions so differ from the vague notices as to not reasonably apprise any person, even a targeted Legislator, reading the notice of the consequence of actually adopting the removal resolutions proposed. Indeed, the motions themselves made no mention of malfeasance, only “I move to remove Mary Ann Yazzie” as a Legislator from Area V; “I move to remove James Greendeer,” etc.
Perhaps most telling is the internal inconsistency of the General Council’s own actions. The Resolutions of Removal, Resolution of the HCN General Council No. 4/27/96-C, D&EatID&E state that, “Illegally calling and holding a General Council.... D(l). In addition to charges related at Items E(l, 2) and F(l, 2) below insufficient notice given and insufficient notice to members of the Nation.” “Calling and holding an illegal General Council of April 20,1996”.
According to HCN Legislature Resolution 04-10-96A, ¶¶ 2 and 3 states: “Whereas, the Ho-Chunk Nation are petitioning for the removal of President Chloris A. Lowe in accordance with Article IXRemoval, Recall and Vacancies; Section 2 General Council Removal of the President, and WHEREAS, the Ho-Chunk Nation members are requesting in writing for the Legislature to call for a General Council Meeting to be conducted on April 20, 1996 with the site to be held at Black River Falls Senior High, Black River Falls, Wisconsin in accordance with Article ICGeneral Council; Section 6-Special Meetings; and” :..
See General Council Resolutions 4/27/96 C, D & E at ¶¶ D & E. Looking to the alleged acts of the General Council itself, notice of nine (9) days, from April 10, 1996 to April 20 1996 was not only insufficient as to members, but quasi-criminal amounting to malfeasance on the part of the Legislators accused. Yet the Notice of the Legislature as reflected in HCN Gen. eral Council Resolutions C, D, & E was specific, stating that the sole action of the April 20, 1996 General Council was to consider the removal of President Lowe and had far more advance notice, ten (10) days, than that given the Legislators here.
In light of these resolutions, which are the only indication from the General Council itself on the proper period of notice to be given, the Court is compelled to hold that a removal notice giving less than ten (10) days is not valid. If it were otherwise, the Notice given by the Legislature for the April 20, 1996 General Council would not have been “insufficient.” This is what a purported majority and quorum of actual eligible Ho-Chunk voters agreed to and endorsed by passing the HCN General Council Resolutions, 4/27/96 C, D, & E.
II. WAS THERE A QUORUM FOR THE ACTIONS OF THE GENERAL COUNCIL OF APRIL 27, 1996?
The HCN Constitution requires that “Each action of the General Council shall require the presence of a quorum/’ Id. Art. IV, § 7. The parties to this controversy contend that a quorum either existed or did not. “This Court held earlier that one issue merely involves counting.” Coalition for Fair Government II v. Lowe et al., CV 96-22 at 14 (HCN Tr Ct. July 28, 1996). *172 This was before the facts of the actual events of April 27, 1996 were known. The versions of the General Council recounted are so dissimilar as to make one believe that the witnesses did not attend the same event.
A. Two Events: Before Walkout and After Walkout
Indeed, there did appear to have been two events. The first General Council event happened in the beginning of the meeting just subsequent to Adam Hall, the enrollment officer, notifying the people who appeared to be in charge at the front of the Ho-Chunk Bingo Hall that there was the equivalent of a quorum of eligible voters registered with him. This by itself is not definitive because registration began at 9:00 a.m. and did not reach the magic number of 648 until after 11:30 a.m. Exhibit A. By then many members could have left after having waited many hours for things to get going.
5 The second General Council event happened after the walkout of several hundred tribal members which occurred sometime after their nominee for presiding officer, Richard Mann, did not muster a majority of votes.[19] This was at about 12:43 p.m. Though, it is impossible to know how many persons walked out, Adam Hall’s count was that there were 767 members registered at 12:17 p.m., and if one assumes that 167 to 169 voting for Richard Mann walked out, the remaining number would be only 600. This number was later increased by nearly 95 new registrants by 1:25 p.m. as recorded by Adam Hall. This could have constituted a quorum, if no one else left the Bingo Hall and all new registrants stayed.
It was after this walkout where Chloris A. Lowe Jr. was elected presiding officer on an announced vote of 682 votes case at about 1:12 p.m.[20] Lowe announced and clarified that no official action of the General Council could happen ■without a quorum. However, after the nomination of Kathyleen Lone Tree—Whiterabbit there was announced a total of only 462 members, far short of the 648 required. This total was counted within twenty minutes of the confirmation of Chloris A. Lowe Jr. as presiding officer. There was evidence that people were still leaving after Lowe was selected. Lowe himself mentioned this. VT at 1:28 p.m.
Shortly after the first failed vote for Ms. Whiterabbit, and despite Lowe’s own repeated statement that business could not continue without a quorum, there was a recount of 581 total votes announced as casting ballots for the position of Secretary of the April 27, 1996 General Council. VT at 1:45 p.m. This amount was again short of a quorum. Instead of stopping, as he had promised because no official action of *173 the General Council could happen without a quorum, the presiding officer Chloris A. Lowe Jr. called for a roll call at 1:54 p.m. The roll call vote took a great deal of time and was completed sometime before 4:23 p.m. No announcement of the number counted during roll call was publicly announced.
B. The Roll Call Vote.
The bulk of the roll call vote cannot be verified because the videotape was not running. The roll call was done by Kathy-leen Lone Tree—Whiterabbit calling out the names and Alex Stephans checking off the names of those responding. The completion of the roll call is not visible on the videotape and can not be objectively verified. However, Mr. Hall, who stayed throughout the proceedings noted that some people left after answering the roll call. Mr. Stephans stated that the roll call was verified by someone having to physically view the responder and that in one incident someone improperly responded for someone not present. This was noted and the name withdrawn until the person approached the podium and verified their presence.
The objective evidence shows that the roll call was completed sometime before the videotape was restarted at 4:23 p.m. A total of 911 people had registered by 3:25 p.m. This is 215 more than had registered at the beginning of proceedings at 12 noon. This is, in theory, enough to make up for the estimated number of people who left, if one believes those walking out totaled the estimated amount voting for Richard Mann. The critical time period occurred after 4:35 p.m. when Lowe reconvened the meeting. Only 25 people registered between 3:25 p.m. and the close of the registration at 6:30 p.m. by which time 936 total people had registered. This means that the number in the hall were not significantly augmented by new registrants during any of the votes on General Council resolutions.
One problem with the evidence submitted is that nothing objective verifies the count of those eligible to vote for Chloris Lowe as presiding officer. After several inconclusive votes for Richard Mann, who everyone assumed needed a quorum voting to be elected, Mr. Lowe was elected during a period Shawnee Hunt declared a quorum was not necessary. After this announcement supported by a vote of 430, an unaccounted for 252 people were announced as participating at the end to make the total 682. Chloris presided over this announcement. He failed to breakdown the vote so that it could be verified.
The number of 252 no or abstaining voters is higher than for any other vote where those numbers were broken down. Moreover, the method of allowing multiple no votes enhanced the possibility of error. However, other indications are that 95 additional people had registered between 12:17 p.m. and 1:25 p.m., and could have made up for the alleged 167 to 169 who voted for Richard Mann and could have voted for or against Chloris Lowe. However, all of this is the realm of speculation. Given that the vote counters during the vote for Mr. Lowe appeared to have been highly biased in his favor, the plaintiffs and opponents have reason to doubt the integrity of the selection of Mr. Lowe as presiding officer.
The defendants claim that all of this is really irrelevant because the significant action which the plaintiffs’ wish to declare improper is the votes that came between 4:35 and 6:30 p.m. However, the Court has laid out the facts as objectively as possible in order see if it had any ramifications on subsequent events.
The testimony of the defendant’s witnesses about the roll call vote appeal's *174 credible. A roll call was conducted. During the short portion that the roll call is visible, everything appears to be in order. Though Mr. Clark thought people answered for someone not actually present around twenty times, he could only clearly recall one incident about a person improperly responding for a friend or relative in the bathroom. This was credibly explained. Answering for another is improper and undermines the roll eall process.[21] Anyone responding for those temporarily absent is perpetuating an error. The Court finds based on the evidence that this was an isolated incident even if Mr. Clark’s count of twenty is accepted. Mr. Stephans testified that over 648 people had responded and they still had a page and a half of names to read off. He also testified that the roll call proceeded to the end of the list. He never gave a number of the total responding to roll call.[22]
C. Procedural Irregularities.
The events of the second half of the General Council are significant because the disclosed vote counts methods and procedures to obtain them varied so widely. The first vote was to appoint, not elect Ms. Lone Tree—Whiterabbit. Mr. Lowe altered the voting procedure from his election which was by raised hand voting to go with a voice vote only. The problem with voice votes as noted in this Court initial decision is that the total can not be verified and was questioned by Bill Winnesheik at the meeting. The videotape supports a conclusion that Ms. Lone Tree—Whiterab-bit did receive a majority of those voting, but voice voting has the drawback of potentially intimidating those in the minority.
After Ms. Lone Tree—Whiterabbit’s appointment, the agenda was approved by a voice vote. The first item on the agenda as adopted was the issue of “80/20.” Mr. Lowe allowed some discussion on this issue. The resolution shows that this vote was on a budget created by Mr. Lowe and his staff. The budget packet was not passed out to every person, since it was delivered late and apparently insufficient numbers of packets were prepared. Mr. Camden discussed the overall goals of the budget, which was for every department, branch and governmental expenditure for an entire fiscal year. There was some discussion, though it was remarkably little considering the detailed nature of the “80/20” budget. This multi-page handout consisting of spreadsheets was not formally made an exhibit.
D. Votes on 80/20
In total there were three votes on “80/20.” The vote for this item was altered from the immediately prior method of voice voting to a raised hand vote. An insufficient number of voters participated to verify a quorum. The announced total was 534 for, 9 against and 16 abstaining for a total of 559. The raised hand vote had enough irregularities to require at least two recounts of one section (the one near the Bingo Hall door) during the middle of the count. The announced total was *175 not a quorum. There were no complaints about the methodology of hand counting.[23]
Nevertheless, despite his multiple prior admonitions that business could not proceed without a quorum, defendant Lowe did not dismiss the meeting, but rather entertained motions for a recount and proceeded. Although there were duly made motions and seconds, Mr. Lowe again altered the procedure by taking a voice vote to approve the motion for a recount. The voice vote was in favor of a recount. Defendant Lowe entertained suggestions on how to proceed and elected to conduct a “standing” vote. This was approved by another voice vote.
The “standing” vote explanation was given and defendant Lowe rejected it as “way too confusing.” The alternative of a “move around” vote, also suggested, and stated that a standing vote would be adequate. The standing vote proceeded. Prior to it being counted, Kelly Decorah complained that people were leaving and later Bill Winneshiek questioned that a voice vote would be valid under the Constitution, apparently because of the problem of being unable to verify if a quorum voted. Nonetheless the vote proceeded. This vote required a mid-counting correction because someone complained that elders in wheelchairs would not be able to stand. Defendant Lowe improvised that such elders could vote by raising their hands. No provision was made to count no votes or abstentions. No tally of the standing vote was ever announced. Marlys Whiteeagle testified that it was just too difficult to get an accurate count with everyone standing up and getting in the line of sight of counters. Tr. II, p. 75. There was testimony that no new people entered the Bingo Hall between the raised hand vote and the later standing or “move around” vote. Tr. I, p. 290. One observer thought that they were over a hundred below quorum for the standing vote. Tr. I, p. 108.
With no count of the “standing” vote announced, Mr. Lowe again changed procedures, and without a motion or other prompting, at 5:36 p.m. immediately ordered yet another count, this time using the previously described “way too confusing” method of moving people around the room. He announced, “I know this is ludicrous but we have to do this at this point.” The “move around” vote was done by first counting the “no” votes and abstaining votes, before to proceeding to the yes votes. Since the no voters and abstainers were small in number, presumably no special methods were used with them. There was much testimony that several people were counted against their will. (Smoke, Stacy-West, Helgeson, Bahr,[24] 0. Mike, Clarice Mike). See, Infra II. F., Re: counting against one’s mil.
The yes votes who occupied the majority were counted by having two vote counters independently count people as they walked through a “chute” or human turnstile, between the counters. Once the person had been counted they were tapped and moved to go sit down. The danger of voting twice was limited by the fact that those having voted would have had to go against the *176 weight of the crowd who had just voted to get to the back of the yes crowd to vote again. Though Marlys Whiteeagle stated this would have been difficult, it would have been possible for some to circle the outside and return to the back of the yes crowd and go through the “chute again.” However, no one testified that this happened. The videotape is inconclusive in documenting the move around vote because the location of activity is too far away to be observed closely. The announced result was 665 for, 22 abstaining and 32 against, substantially larger than the 559 counted during the raised hand vote.
E. Double Counting and Forced Attendance.
There were multiple complaints of being counted against one’s will, being ordered to attend the meeting and double counting. The testimony of double counting from Mr. Clark had to have occurred prior to his leaving the Bingo Hall at 5:15 p.m. This occurrence does not alter the count on the “move around” vote because that took place nearly twenty minutes after Mr. Clark left. The procedure at the time Mr. Clark was present may have required two counters each to independently verify the tally. Double counting during this period, even if it had occurred would have distorted the vote count upwards on either the raised hand 80/20 vote which was 89 below quorum or the standing vote which was never announced. Since neither count achieved quorum, double counting could not have altered the result.
The evidence of being required, or ordered to attend the meeting was clear and credible. Tr. I, at 285. Two security guards were told to attend. Tr. I, p. 285., Tr. I, p. 130 (Announcement over the loudspeaker for employees to register). Tr. I, p. 247 (I heard they were calling different places to people to attend), Tr. II, p. 16-21 (Guard told to go get people at Ho-Chunk Lodge). The evidence of being counted against one’s will was also clear (Testimony of Melanie Stacy West; Phyllis Smoke; Matt Bahr, Ernestine Helgeson) during the “move around” vote.
F. Participants Being Counted Against Their Will.
The court finds the complaints about being counted against one’s will, though distressing to those who did not desire this to occur, did occur. It, however, is without legal relevance. The requirement for a quorum at General Council merely requires that a quorum be “present,” not that the people have to participate. HCN CONSTITUTION, ART. IV, § 7. Thus, though a person may have a good reason for not wanting to be counted, they are faced with a Hobbesian choice: Not participate and get counted against one’s will, or leave and not know what went on. To the extent the people were marked down as voting either for, or against, such counting-distorted the numbers. People not wanting to be counted were abstainers and must have been counted as such, but it does not alter the total number for quorum. The only one who did testify about being ineligible was Mr. Bahr, a non-member. Subtracting his vote does not alter the outcome.
The issue of being ordered to attend is more troubling because, if true, it would violate each Ho-Chunk’s right to liberty who was told, or ordered to attend. HCN Constitution, Art. X, § 1(a)(8). The President or Legislature has the right to excuse member employees from work to attend a General Council, but may not “order” that they must attend. This would restrict their freedom of movement, which is a liberty interest for a non-work related task. Voting or not voting is likewise a *177 form of expression protected by the freedom of speech clause. HCN Constitution, Akt. X, § 1(a)(1). Member employees may not be ordered to participate in a process to validate something such as a specific piece of Legislation that they are opposed to, or do not wish to participate in, just so the numbers will be high enough to achieve quorum.[25] If sufficient numbers were forced, it would invalidate any votes where this was in question. However, the credible testimony only established that two maybe three employees felt compelled to attend. This number is insufficient to invalidate the “move around” vote.
G. Quorum.
The conclusion of whether a quorum existed or not, is complicated because the evidence is not clear cut either way. If it is the burden of the plaintiffs to disprove that a quorum existed, the evidence is inconclusive. If it is the burden of the proponents of 80/20 to prove that quorum existed, the evidence is also inconclusive. One can neither prove a quorum existed nor that it did not exist. This is possible because the procedures used In the April 27, 1996 General Council were so varied and lacking in objective verification.
For example, by 1:14 p.m. the meeting had proceeded forward with four people in charge: Mr. Shawnee Hunt, Angie Waege, Robert Funmaker, Shawnee Hunt again and Chloris Lowe Jr. Each person used different methods and procedures. Different assumptions were used by each person in charge. No formal procedures were ever adopted by any type of vote. No complete or clear methodology of voting was ever completely explained prior to the votes taken that was not altered in midstream. Volunteer counters were not given any instructions on how to proceed or told that only persons with badges or wrist bands could be counted. Wristbands and packets with proposed agenda were not delivered on time. Some wristbands were handed out by the President’s personal staff to registrants who had come before the bands arrived, but control over who got them was not assured in a fair and impartial manner.
Volunteer counters and tally personnel appear to be so biased in favor or against a certain outcome that no matter how objectively and conscientiously they did their job, the fact that they either cheered, clapped, shouted and screamed or walked out, compromised the belief by their opponents that they were not distorting the results to achieve their desired agenda. The videotape which shows much of the proceedings, though objective to a large degree, is not conclusive because it did not pan over to where the action was. It was primarily focused on the front of the Bingo Hall. At the critical vote on 80/20 it does not show whether people entered or left the Bingo Hall or how many walked through the previously described “chute.”
This leads to the discussion of the critical evidence which demonstrates that there are two critical vote counts, which cannot be objectively verified. These are the unexplained tallies of 230 abstentions and no votes for Chloris Lowe’s selection as presiding officer, and the mysterious jump in numbers from 559 on the raised hand vote to the 719 vote on the self described ludicrous “move around” vote. This is an increase of 160 votes during a *178 period in which all testimony agreed no great numbers of people entered or left the Bingo Hall and there were only 25 new registrants.
It is unfortunate that Mr. Lowe abandoned the “move around” vote immediately after using it once. This would have at least verified two consecutive counts that the numbers claimed on the first vote were close to the numbers on a second vote. Instead, Mr. Lowe changed his procedures to permit multiple voice votes where the numbers cannot be verified in any way. Though voice votes can be used for minor procedural items, any vote on a substantive item where a quorum cannot be verified cannot be presumed to be properly enacted.
Mr. Lowe has made much about presumptions of quorum continuing unless challenged within a General Council itself. He quotes Robert’s Rules of Order for the proposition that a quorum is presumed unless challenged. Defendant Lowe’s Post Trial Brief at 5, and Exhibit D. The Court notes that in the section of the rules quoted there is also a duty of the chair when they notice an absence of a quorum to declare that fact, and not to proceed further except to complete debate and to adjourn. See also Robert’s Rules of Order: The Standard Guide to Parliamentary Procedure at 124-125 (Bantam Books 1986). The Court does not agree that a quorum is presumed under the HCN Constitution when major substantive matters are being considered. Moreover, Mr. Lowe seeks to pick and choose which Robert’s Rules he wished to use. If he used the rule regarding lack of quorum, he would have been compelled to adjourn the meeting after the two failed votes for Kathy Lone Tree-Whiterabbit, as well as, after the first two failed “80/20” votes. Mr. Lowe did not state he was using Robert’s Rules of Order, nor did Mr. Hunt, Mr. Funmaker nor Ms. Waege. The haphazard, “catch as catch can” rules of doing things without announced rules deprives them of any presumptions either way.[26]
The Court does not accept that a quorum continues unless challenged internally at the meeting itself because this was not disclosed as an operating rule by the presiding officer once he assumed control of the meeting. Further, such a rule would violate the HCN Constitution’s guarantee that a member has the right to redress of grievances from his government. HCN Constitution, Art. X, § 1(a)(1). Thus, unless specifically adopted by the General Council as binding that a member may not challenge the existence of a quorum outside of the General Council, the redress of grievances to Court is not limited, by a resort to Robert’s Rules, which Mr. Lowe claimed he followed loosely.
The importance of the quorum being able to be proven empirically by objective verifiable procedures goes not only to whether the vote was enacted by a quorum, but also to whether the actions passed will gain wide acknowledgment and adherence once passed by those charged with its enforcement. This is especially true in a case where such a divisive and potentially risky fiscal plan is being aggressively pushed. However, it is not the Court’s role to make political decisions regarding fiscal matters. That is a matter for the President and Legislature to work together on. The Court’s role is to make sure that fiscal actions are properly enact *179 ed, not generally to question their substantive merit.
The Court has not enjoined or prevented the enforcement of the 80/20 resolution in any way, yet the 80/20 plan has not been enacted by the HCN Legislature. Both Mr. Lowe and Ms. Lone Tree—Whiterab-bit assert this Court lacks jurisdiction, yet did not press this argument post trial. Now they also seek a declaration that a quorum was present and that the Court enforce the edicts of the General Council purportedly passed. The defendants cannot have it both ways.
It is this Court’s ruling that it does have jurisdiction to issue a declaratory judgement, but not to issue a monetary judgement. See HCN Constitution, Art. VII, § 6(a). The Court finds based on its prior ruling and assumption that the burden of proof to disprove that a quorum for action of the General Council is on the plaintiffs, that they have not carried that burden as to the “move around” vote. Were the Court to base its decision on the fact that Mr. Lowe violated Robeet’s Rules of Order in continuing the meeting once it was clear an insufficient number were present to constitute a quorum, it would be compelled to rule that all subsequent actions including the two recounts each with a different method were illegal and that the last 80/20 vote could not be valid even with a quorum. There is sufficient credible evidence to support this position.
The HCN CONSTITUTION, ART. IV, § 7 states that each action of the General Council shall require the presence of a quorum. The actions of Mr. Lowe in proceeding with the acknowledged lack of a quorum appear to violate this section. His actions in trying to force a quorum by apparently ordering member employees to report and register and by conducting multiple recounts on votes after the first count revealed a lack of quorum, then switching to unverifiable votes all appear to undermine the credibility of the propriety of the passage of the “80/20” vote and subsequent actions.
In the closing of the trial portion of this case the Court stated that outside counsel will finish this case and leave to their workaday lives. The members of the Nation must live with the consequences of this action and with each other. Those that support the “80/20” plan are deeply set in their beliefs and will not accept a ruling otherwise, no matter how irregular the procedures and methods used to obtain it. Those that reject the “80/20” plan believe that the irregularities in the process so corrupted the outcome that no matter the ruling of this Court, it is not valid. The sears from this will cause a deep division for years to come.
Therefore, despite its ruling that the plaintiffs did not carry their burden as to disproving the existence of a quorum on “move around” vote for the “80/20 plan,” the Court urges the members of the Nation to revisit the “80/20 plan” using procedures agreed to in advance after a roll call has clearly established a quorum. Many of the methods suggested by Diane Martin, League of Women Voters Representative, should be considered such as using colored numbered ballots, a voting machine, counters from each side of the issue verifying each other’s tally, a neutral announcer, full disclosure of the numbers for each subsection of voting on each vote regardless of success [ayes, nays, abstentions], having counters and totallers signing voting sheets so that they can be identified to testify later, clearly marking sections of the floor so tally counters know exactly who they are responsible for counting, verification of votes between counters after each row or section counted is allowing only visibly eligible voters to cast votes, having subgroups of vote to- *180 tallers verifying the votes cast for each subsection of floor previously set off, having a special person to count the counters vote so they cannot be accused of improper voting.
This lack of clarity and convincing proof for the proponents of 80/20 is directly attributable to the questionable methods used to force the issue by Mr. Lowe. This is yet another reason why a presumption of regularity cannot be given to any of the actions taken on April 27, 1996. Mr. Lowe has called four General Councils, setting a proposed agenda, and each time his office has assisted in the preparation of packets, and he has been selected to preside over two of them. Unless procedures are changed, so that substantial decisions of the General Council can be objectively verified, the resulting disbelief that such votes were valid and the instability accompanying such disbelief will undermine the strength and unity of the Ho-Chunk Nation.
III. RESOLUTION OF THE CLAIM CHALLENGING THE GRANT OF VETO POWER AND VIOLATION OF THE INDIAN GAMING REGULATORY ACT.
-The power to make law is that of the Legislature. The power to make to enforce and administer law.is that of the Executive and the power to interpret that law is the exclusive province of the Judiciary. The power to veto legislation is in effect the power to prevent the making of law, or control the legislation. Allowing a single branch of government to control both the making and administration of the law alters the constitutional balance of power.
The broadly worded Complaint initially encompassed an issue on the validity of a resolution by the General Council empowering the HCN President with veto power. The passage of the resolution by the General Council on April 27, 1996 authorizing and enabling “Veto Power” for the President has not been developed nor briefed by either party. The General Council of April 27,1996 allegedly passed a resolution empowering the HCN President with Veto power. Although, the alleged granting of veto power to the defendant Chairman, as the HCN President, was one action taken on April 27, 1996 General Council, this issue has not proved central to the case nor is it essential to the issues being resolved or considered by the Court at this time. Additionally and due to his near continuous absence from the Legislative sessions, the Veto has never been used.
The veto issue is not essential to disposition of this case and is not decided by the Court, today. The plaintiff has not pursued prosecution of this issue. Whether veto power was validly passed, or whether the General Council has authority to grant such power absent amendment of the HCN Constitution, need not be reached. This issue is expressly reserved for a concrete case or controversy.
The plaintiffs pled the issue that the 80/20 plan violates the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 Et seq. in their Complaint but did not address this issue at trial. This issue is complicated and based on factual evidence not presented at trial, nor has the issue been briefed by any party. The Court therefore declines to reach this issue because it was not properly presented. The Court likewise does not address many of the affirmative defenses of the defendants, such as sovereign immunity, because they did not present either facts nor arguments that would permit this court to even address many of those issues,
CONCLUSION
For all of the previously cited reasons, this Court is persuaded that the attempted *181 removal oí the three Legislators violated the HCN Constitution and the rights of the two identified Coalition members to be represented by Legislators of their choice. The HCN Legislature has standing to seek a declaratory judgement of how they may be removed pursuant to HCN Constitution, Akt. IX, § 1. The methods and means employed do not pass the requirements of the HCN Constitution, due process, and the General Council’s own guidelines as indicated by its resolutions. Although the General Council could have chosen to recall the Legislators, which is far more democratic and does not require a showing of malfeasance and only a modicum of notice, against the advice of Mr. Lowe, they chose the harder route which requires notice and the right to be heard. Due to the noted violations, the actions to remove the three (3) HCN Legislators based on the April 27, 1996 General Council are unconstitutional and are permanently enjoined. The Court previously found that the Coalition for Fair Government II has standing to pursue this case. Although the membership and nature of this organization was not gone into in any detail at trial, defendants had a dear opportunity to show that this organization lacked standing, yet appeared to abandon the issue. In light of this, the basis and explanation that the Coalition had standing on the basis of its two known members -who are directly represented by Legislators they wish to retain, is reaffirmed.
On the issue of whether a quorum was present for the actions of the General Council objected to, the Court finds that the plaintiffs failed to prove a quorum could not have existed. If the proper method is on the proponents to prove that a quorum existed on April 27, 1996, the Court would be forced to rule that clear and convincing evidence does not support this. The Court is left with this decision being tipped by a presumption because there is no objectively verifiable proof either way.
The Court urges that the proponents revisit the 80/20 issue and pass it using clear and convincing evidence so that all doubt is removed that it was properly and duly enacted. In either case the 80/20 proposition really only constitutes an annual budget and will expire at the end of the fiscal year.
The Court makes no ruling on the Veto Power resolution since the question of the power to alter the balance of power in the HCN Constitution by the General Council absent a Special Election was never briefed. Similarly, the Court declines to rule on the issue that 80/20 violates IGRA, since it also was never briefed. Since the Court does not have a waiver of sovereign immunity sufficient to grant monetary relief, all claims for attorney’s fees and costs are denied.

. There are two discernable time references being used in the discussion of this case. The parties have stipulated that the video tape, Exhibit C, had a recording timer/clock that was one hour behind the actual time. The videotape clock is referred to in the body of this opinion as ‘'VT,” followed by the real time or actual time of certain events given in the normal “a.m.” or “p.m." delineation. Events during the General Council may have occurred at 4:11 p.m., but the reference on the videotape exhibit would be VT at 3:11. Also, Tr. I indicates the transcript for the first day of trial. Tr. II indicates the transcript for the second day of trial, and Tr. Ill indicates the trial transcript for day three of trial, which is followed by the appropriate page number.

. The sound quality of the videotape during the period is occasionally interrupted by squawks and feedback because more than two sound systems, or microphones were being used simultaneously.

. There were shouts that the motion was out of order and Marlys Whiteeagle attempted to remove Ms. Waege's microphone at this time, which appeared to be a personal portable microphone.

. Robert Funmaker did not summarize the method of casting votes prior to calling the counting such as, "we will first call for the yes votes and then the nays and then the abstentions; the total cast will determine if there is a quorum,” Roberta Funmaker Greendeer (Bear clan) was informally made head counter. VT at 11:19.

. Throughout the tape, Christine Jendrisak is seen going up to the front to see to totals of the votes tallied. She is present throughout the meeting.

. At this point Mr. Stephens is frequently seen either turning his head away to consult with Lowe or to look at Ms. Martin's figures. He is not looking at the front.

. During this period the video camera is focused solely on the podium area and so it is not possible to see what if anything was shouted.

. The Constitution already requires a Code of F.tbics be adopted. HCN Co\sna.iio\ Art. V., § 3.

. The Notice states in the Certification section, ‘‘We, member of the General Council Planning Committee, the delegated body of the General Council." Plaintiffs Exhibit 1 (April 23, 1996 Notice). Other than this self declaration, no proof was ever offered of any minutes or other official documents of any previous General Council validating this claim.

. Being able to go against an initiative of the Executive branch is quintessentially a function of the notion of balance of powers and was specifically permitted by the Constitution which carefully diffused power from an all powerful Business Committee under the Wisconsin Winnebago Nation Constitution to the current separation of powers. To make this malfeasance would make the Executive branch all powerful, precisely what the Ho-Chunk voters rejected in adopting the Constitution.

. In light of the repeated clashes between the Legislative and Executive branch not only is a declaratory judgement action not trivial, it is the only prudent course of action to take.

. No minutes or official record of this General Council was ever presented. All parties conceded that no such records even exist. It is hard to see how failing to enact actions of the November 4, 1995 General Council was even possible. Tr. Ill, p. 48-51.

. It is hard to understand that a charge of calling a General Council, which the Legislature is expressly permitted to do, pursuant to HCN Constitution, Art. IV, § 6, is malfeasance if the Notice is given to the President by the Legislature and he refused to issue the notice because the main agenda item is the President's removal. Pursuant to Art. IV, § 6 the President’s duty to issue the notice is mandatory and non-discretionary, "[Njotice shall be provided by the President for all Special Meetings of the General Council.” Id.

. Given the lack of Constitutional authority for the GCPC to do anything, let alone call a General Council on its own, this charge is frivolous.

. Other than the “lying to constituents claim” and the “failure to approve Executive Directors without good cause,” all the other claims constitute nothing more than political disagreements with the “alleged malfeasant” Legislators. As the HCN Constitution makes clear and unequivocal, no branch of the Ho-Chunk government can make something illegal after the fact. This is the classic case of “ex post facto” lawmaking expressly prohibited to all branches of the Ho-Chunk government, even the General Council. HCN Constitution. Art. X, § 1 Bill of Rights, subsection, (a)(9), “The Ho-Chunk Nation in exercising its powers of self-government, shall not: pass any bill of attainder or ex post facto law].]” An Ex post facto law is defined as, “A law passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed”. Black’s Law Dictionary, p. 520 [5th ed.1979], See also U.S. Constitution, Art, I, § 10.

. It must be clarified that Gordon v. Leather-man is a recall election case. In a recall case little or no reason need be given for the recall election. Removal is distinct from a recall. Both methods are a means to have an individual taken out of office. Gordon v. Leathennan is not a removal case like the case here. Elected officials are given greater protections under the removal section than under the recall section of the HCN Constitution. That is because a recall vote is akin to a vote of confidence where the elector need have no clearly articulable reason for voting against an elected official than when they were first elected. In contradistinction where "malfeasance” is alleged, there is a provision for the elected official to speak out and respond to the claims of malfeasance because their reputation, political future, as well as livelihood are at stake. Ona Garvin testified that she was prepared to speak out but finally left at 5:15 p.m., believing that nothing would be accomplished. Tr. I, p. 70, 73.

. Indeed, it is disingenuous to argue that the Legislators would have a reasonable opportunity to be heard when they were never actually given a copy of the resolutions detailing the vague charges in the Notice. Even if that had been done, and both Ona Garvin and James Greendeer who attended the opening of the General Council denied receiving these packets, notice of a few hours is patently insufficient to let them have a reasonable opportunity to be heard. Much additional testimony corroborated the fact the packets were brought late and were unavailable to many attendees: Greendeer, Garvin, Visintine, etc.

. Though Ms. Visintine’s suggestion that Ho-Chunk translators be provided is helpful and would insure that all members understood what was going on, it is not required.

. Tlie only testimony of any vote total for Richard Mann was by Marlys Whiteeagle who assisted Ms. Roberta Greendeer and who was a Chloris Lowe supporter. Marlys Whiteea-gle stated that one counter announced a total of 167 votes, another 169 votes and Roberta Greendeer was reported as saying there were 232 votes. Again, none of the totals were announced and so the numbers are highly unreliable.

. Mr. Hall's running tallies of registrants show that there were 696 registrants when he went to the front of the Bingo hall, more than the 648 required. By the time the vote for Lowe is announced at 1:12 p.m. there were between 806 and 862 registrants, or 164 more than when Mr. Hall announced a quorum had registered. However, at least a hundred to as many as two hundred people walked out at 12:43 p.m. prior to the vote for Lowe. The only objective evidence of this number is that nearly 100 seats in front which were filled when the vote for Richard Mann occurred were nearly empty during the vote for Lowe, Nakai and Dahl. See also Testimony of Tom Jones. Tr. I, p. 1 14.

. Defendant Lowe has argued that it is beyond the scope of the Judiciary to require or mandate procedures for the General Council as that is a power given solely to the General Council. The Court is largely in agreement with this with the above reservation that General Council procedures which distort the number of persons present will be given close scrutiny to see if that would affect the ability to hold a quorum. There is no proxy voting in General Council, thus answering for another distorts the number present because the person is not actually there, and may never return despite good faith of the substitute calling out for them.

. Ms. Whiterabbit’s final count of 719 is based solely on the totals for the "move around" vote.

. There was some testimony that counting would have proceeded better if the counters started in the back rather than in the front because the people being counted wouldn't put their hand down too early thinking they had already been counted. This method was adopted only late in the proceeding.

. The Court found Mr. Bahr’s testimony credible that he was counted. He was not a tribal member. He further testified that non-Ho-Chunk spouses and other non-members were in the entryway of the Bingo Hall as directed. This is also where many other members not wanting to be counted were located: Stacy-West, Owen Mike, Clarice Mike, Ernestine Helgeson. Tr. I, p. 113.

. Much ink was spilled in argument to characterize those opposed to 80/20 as somehow subverting the will of the Ho-Chunk people. This was neither useful nor probative. If members walked out of a General Council purposefully to defeat a quorum and frustrate the agenda of those in the majority, they have a Constitutional right to do so. This implicates both the right to peaceably assemble and freedom of speech.

. Indeed, accepting Robert’s Rules for this meeting would inject yet more errors into it since Mr. Lowe can be seen voting on the 80/20 vote when the general rule is that chairpersons of meetings may not vote unless the outcome might be changed such as in the case of a tie or near tie. Mr. Lowe made a highly visible vote in favor of 80/20.