*146 Denial of Preliminary Injunction
MARK BUTTERFIELD, Chief Judge.
INTRODUCTION
In this case the duly elected President of the Ho-Chunk Nation and Various supporters challenge his removal as President by a vote of the General Council. In particular, in the hearing held November 16, 2000, the plaintiffs moved to prevent the holding of an election for a seat on the Legislature vacated by the former Vice President who is required to act as President pro tempore after the removal of plaintiff Jacob Lonetree. The special election was to be held November 18, 2000.
At the hearing on November 16, 2000 the defendant argued that the plaintiffs, none of whom are electors from Area I, which contains the vacant seat, had standing to challenge the holding of the special election and that the case as a whole presented a political question beyond the ability of the courts to decide.[1]
Facts
1. Jacob Lonetree was duly elected as President of the Ho-Chunk Nation in the General Election of 1999. He was elected to a four-year term due to expire sometime after June 2003.
2. Forrest Whiterabbit is a Ho-Chunk tribal member, who held the position of Tribal Treasurer under Jacob Lonetree. He is the brother-in-law of Jacob Lonetree. He resided in Hatfield Wisconsin, which is in Area I, while he was Treasurer, but filed his taxes in Colorado for 1999 and intends to file his taxes in Colorado in 2000. His wife, Kathyleen Lonetree-Whiterabbit, is the representative for Area V, which requires residency outside of the 14 counties listed in the Ho-Chunk Nation Constitution. Mr. Whiterabbit is not a *147 resident of Area I for the purposes of voting within the Ho-Chunk Nation.
3. Mr. Elliot Littlejohn is a tribal member elector who resides in LaCrosse, Wisconsin, which is in Area II of the Ho-Chunk Nation.
4. Ms. Libby Fairchild is a tribal member elector who resides in the State of Minnesota, which is in Area V of the Ho-Chunk Nation. Ms. Fairchild held a position in the Office of the President under Jacob Lonetree.
5. Mr. Spencer Lonetree is a tribal member elector who is the brother of Jacob Lonetree and resides in Area V in the State of Iowa. Mr. Spencer Lonetree held various positions in the Office of the President under his brother Jacob Lonetree.
6. Mr. Parmenton Decorah is a tribal member elector who resides in Area IV of the Ho-Chunk Nation in Mau-ston, Wisconsin.
7. Mr. Forrest Whiterabbit was nominated to the position of Treasurer of the Ho-Chunk Nation by Jacob Lonetree and was confirmed by a vote of the Ho-Chunk Nation Legislature. He serves at the pleasure of the President of the Ho-Chunk Nation and can be fired by him/her for any reason. See Daniel Sine v. Jacob Lonetree, CV 97-143 (HCN Tr. Ct. Aug. 3,1998).
8. Libby Fairchild and Spencer Lone-tree were employed as the personal staff of President Lonetree prior to his removal by the General Council.
9. Gloria Visintin, a tribal member, served President Lonetree with papers alleging malfeasance in office on October 3, 2000. The papers alleging malfeasance gave notice to President Lonetree that various members of the Ho-Chunk Nation intended to seek his removal at the Annual General Council called for October 21, 2000.
10. President Lonetree had previously called the Annual General Council for October 21, 2000 to be held at the Ho-Chunk Nation Convention Center in Baraboo, Wisconsin.
11. A story appeared in the Wisconsin State Journal on October 20, 2000, the day before the General Council, in which President Lonetree denied the charges of malfeasance and stated, that if removal occurred, “so be it.”
12. At the Annual General Council on October 21, 2000 Mr. Robert Fun-maker served as the Chairman. President Lonetree was nominated to serve as chairman, but declined the nomination.
13. Robert Funmaker then appointed Darcy Funmaker Rave to serve as General Council Secretary. HCN Constitution, Art. IV. § 7.
14. According to the minutes, the issue of the alleged malfeasance of President Lonetree was brought up upon motion by defendant Visintin. This was seconded by tribal member Christine (Whiterabbit) Jendri-sak. See Exhibit B attached to the Complaint.
15. Various other items were put on the agenda of the General Council including considering the removal of ineligible members from the rolls; to increase per capita; to consider a zero tolerance policy for appointed and elected officials; to hear the General Council Planning Committee; to hear the Treasurer’s report. The agenda was accepted. Id.
*148 Hi. After the approval of the agenda President Lonetree was given the opportunity to defend himself against the charges of malfeasance. Testimony established that Jacob Lonetree explained his position for 15 minutes including the fact that the HCN Dept, of Justice had stated that it was okay for him to sign a contract mentioned in the notice of intent to remove for malfeasance.
17. A vote was taken with 599 voting for removal and 548 against removal.
18. The next General Election for the Ho-Chunk Nation is due to be held in June 2001.
19. Clarence Pettibone was first elected as an Area I Legislator in the disputed 1995 General Election. See Generally Robert L. Fun-maker, Jr. v. Ho-Chunk Nation Election Board, CV 95-04 (HCN Tr. Ct., July 6, 1995). He served his full four year term and was reelected in the June 1999 Election, which also saw the election of Jacob Lon-etree as President of the Ho-Chunk Nation for a full four year term.
20. Jacob Lonetree was first elected to fill the remainder of the term of Chloris A. Lowe Jr. who was removed by General Council action in 1997. He served from the General Election in June 1997 until the end of the vacant Chloris A. Lowe Jr. term in June 1999. He was then elected to a four-year term in his own right in 1999. Jacob Lonetree was in only the first half of his second year in this term of office.
21. There are nine candidates for the position as replacement Legislator for Area I. These include two former Area I Legislators, Robert Mudd and Douglas Greengrass and one former Tribal Chairman, Gordon Thunder.
22. The election set for November 18, 2000 will cost anywhere from $10,000 to $20,000. This consists of the cost of three poll workers; the stipends and mileage for the Election Board after the election so they can meet and certify the election results, the cost of the consultant, the election equipment and printing the ballots.
23. If no candidate is elected by a majority vote on November 18, 2000 a run-off election will need to be held in two weeks to a month after the November 18 special election.
24. The HCN Constitution requires that anyone elected be sworn into office four Wednesdays after the results are certified. This would be a minimum of thirty days after November 18, 2000, which is a Saturday.
APPLICABLE LAW
HCN Constitution
ARTICLE III—ORGANIZATION OF THE GOVERNMENT
Section 1. Sovereignty. The Ho-Chunk Nation possesses inherent sovereign powers by virtue of self-government and democracy.
Section 2. Branches of Government,. The government of the Ho-Chunk Nation shall be composed of four (4) branches: General Council, Legislature, Executive, and Judiciary.
Section 3. Separation of Functions. No branch of the government shall exercise the powers or functions delegated to another branch.
*149 Section 4. Supremacy Clause. This Constitution shall be the supreme law over the territory and within the jurisdiction of the Ho-Chunk Nation.
ARTICLE IV—GENERAL COUNCIL
Section 1. Powers of the General Council. The People of the Ho-Chunk Nation hereby grant all inherent sovereign powers to the General Council. All eligible voters of the Ho-Chunk Nation are entitled to participate in General Council.
Section 2. Delegation of Authority. The General Council hereby authorizes the legislative branch to make laws and appropriate funds in accordance with Article V. The General Council hereby authorizes the executive branch to enforce the laws and administer funds in accordance with Article VI. The General Council hereby authorizes the judicial branch to interpret and apply the laws and Constitution of the Nation in accordance with Article VII.
Section 3. Powers Retained by the General Council.
(a) The General Council retains the power to set policy for the Nation.
(b) The General Council retains the powTer to review and reverse actions of the Legislature except those enumerated in Section 4 of this Article. The General Council shall return such reversals to the Legislature for reconsideration consistent with the action of the General Council. The General Council retains the power to review and reverse decisions of the Judiciary, which interpret actions of the Legislature. The General Council does not retain the power to review and reverse decisions of the Judiciary, which interpret this Constitution.
(c) The General Council retains the power to propose amendments in accordance with Article XIII, including those, which reverse decisions of the Judiciary interpreting this Constitution.
(d) The General Council retains the power to establish its own procedures in accordance with this Constitution.
(e) The General Council retains the power to call a Special Election.
(f) Actions by the General Council shall be binding.
Section 4. Excepted Powers. The General Council does not retain the power to review actions relating to the hiring or firing of personnel.
Section 5. Annual Meetings. The People shall meet in General Council at least one time each year, which shall be called by the President and at other times as provided in Section 6 of this Article. Notice shall be provided by the President for all Annual Meetings of the General Council.
Section 6. Special Meetings. Special Meetings of the General Council shall be called by the President upon petition by twenty (20) percent of the eligible voters, or upon written request of a majority of the Legislature, or wrhen deemed necessary by the President. Notice shall be provided by the President for all Special Meetings of the General Council.
Section 7. Procedures. Twenty (20) percent of the eligible voters of the Nation present in General Council shall constitute a quorum. Each action of the General Council shall require the presence of a quorum. The President shall call all Annual and Special General Council Meetings, except those meetings called pursuant to Article IX, Section 2. When a quorum is attained, the General Council shall select either the President or another person to conduct the meeting. A secretary shall be appointed to record the minutes *150 of an General Council meetings, including any votes taken. The secretary shall transmit the minutes of General Council meetings to the Legislature.
ARTICLE VIII—ELECTIONS
Section 1. General Elections. General Elections shall be held on the first Tuesday in June of odd numbered years. Offices of the Legislature, Executive, and Judiciary shall be filled at General Elections.
Section 2. Special Elections. Special Elections shall be held when called for by the General Council, the Legislature, or by this Constitution or appropriate ordinances. In all Special Elections, notice shall be provided to the voters.
Section 5. Eligible Voters. Any member of the Ho-Chunk Nation who is at least eighteen (18) years old and who meets all other requirements established by the Ho-Chunk Nation shall be eligible to vote.
Section 6. Certification of Election Results. The Election Board shall certify election results within three (3) days after the date of the election.
Section 7. Challenges of Election Results. Any member of the Ho-Chunk Nation may challenge the results of any election by filing suit in Tribal Court within ten (10) days after the Election Board certifies the election results. The Tribal Court shall hear and decide a challenge to any election within twenty (20) days after the challenge is filed in Tribal Court.
Section 8. Oath of Office. The Election Board shall administer the oath for the offices of. President, Legislature, and Judiciary on the 4th Wednesday following the election after the Election Board certifies the Election results.
ARTICLE IX—REMOVAL, RECALL AND VACANCIES
Section 1. General Council Removal of Legislators. The General Council may remove any member of the Legislature for malfeasance. No vote by the General Council to remove a member of the Legislature shall take place before such Legislator has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.
Section 2. General Council Removal of the President. The General Council may remove the President for malfeasance. No vote by the General Council to remove the President shall take place before such President has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.
Section 9. Vacancy of the Office of the President. If the office of the President becomes vacant by reason of death, mental or physical incapacity, removal or recall vote, resignation, or for any other reason, such vacancy shall be filled in the following manner:
(a) If twelve (12) months or more remain before the next General Election, the Vice President shall serve as President pro tempore and the Election Board shall call a Special Election in accordance with Article VIII. Upon election of a President at a Special Election, the Vice President shall reassume his seat on the Legislature for the remainder of his term, if any.
(b) If less than twelve (12) months remain before the next General Election, the Vice President shall serve as President pro tempore. If less than twelve (12) months but more than three (3) months remain before the next General Election, the Election Board shall call a Special Election in the appropriate District within thirty (30) days to fill the seat vacated by the Vice President. *151 Upon election of a President at the next General Election, the Vice President shall reassume his seat on the Legislature for the remainder of his term, if any.
(c) If less than three (3) months remain before the next General Election, the office shall remain vacant.
(d) A Vice President serving in the capacity of President pro tempore shall not vote in the Legislature except to case the deciding vote in case of a tie.
DECISION
In this case the plaintiff, President Jacob Lonetree, his brother and other supporters challenge his removal. However, the issue before the Court in this portion of the case is a request for a preliminary injunction to stop the Special Election of November 18, 2000. That election is being held to fill the legislative seat temporarily vacated by Clarence Pettibone, Vice President and HCN Legislator for Area I (Black River Falls—Jackson, Clark and Eau Claire Co.’s), who has stepped up to fill the position of President pro tern created by the removal of President Lonetree at the October 21, 2000 General Council. The plaintiff argues that electing someone to fill the seat will change the status quo so that when and if the plaintiff prevails on his main claim the President pro tern will step down to the office of Vice President and Area I Legislator and the person to be elected November 18, 2000 will lose their seat.
The plaintiffs argue that they have standing as tribal members and persons directly affected by the removal of Jacob Lonetree as President of the Ho-Chunk Nation to pursue this case. In the alternative, plaintiffs argue that the removal of a President at a General Council under HCN Constitution Art. IX, § 2 is “an election” within the meaning of Art. VIII, § 2, which any Tribal member may challenge pursuant to HCN Constitution Art. VIII, § 7. If there is an election challenge pursuant to Art. VIII, § 7 the challenge must be resolved within 20 days of filing of the challenge. See Id.
The defendant points out that none of the plaintiffs are residents of Area I and alleges that their rights are unaffected by the election. They are likened to taxpayers under Federal standing law which have been found to have an insufficiently particularized injury when alleging the misapplication or wrongful spending of Federal tax dollars by Congress or the Executive branch. See Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).
In resolving this dispute regarding the election, the Court will first determine whether this case must be fast tracked under Art. VIII § 7 or whether it can proceed in the regular course of litigation. Second the Court must determine standing for this issue, then standing of the plaintiffs as a whole to challenge the October 21, 2000 General Council and finally whether or not they are able to meet the standards set forth under Ho-Chunk law for a preliminary injunction to stop the election set for November 18, 2000.
I. Is A General Council Removal an Election?
The Court is forced to take this issue out of order because it presents a pressing issue of the time management of this case. Under Ho-Chunk law any election challenge must be filed within 10 days of an election and once filed, it must be resolved by the Trial Court within 20 days after it is filed. See HCN Const. Art. VIII § 7; Joyce Warner v. HCN Election Bd, CV 95-03 (HCN Tr. Ct. July 5, 1995). This serves the salutary purpose of providing a quick decision for who is to be seated in political elections and allows for greater *152 certainty to who is In charge. This provides for great stability in government of the Nation by removing uncertainty and making for a speedy transition in power.
The Court concludes that a vote to remove a President under HCN Const. Akt. IX § 2 is not an election within the meaning of HCN Const. Art VIII § 7. First the word “election” does not appear in the presidential removal section, Art. IX § 2. Only the word “vote” appears in § 2, not election. As previous decisions of this Court have noted, the Ho-Chunk Nation Constitution is a carefully crafted document. Election has a defined meaning under Art. VIII. All elections under Art. VIII are conducted by the Election Board, Art. VIII § 4, and must follow the Election Code Art. VIII, § 3. That is not the case in a General Council presidential removal under Art IX § 2.
This interpretation also recognizes that a removal is a different creature than a recall election. The General Council has the authority to remove a President under both sections. A recall election requires no reason be given for voting against a president but the election must be conducted in accordance with the Election Section of the Ho-Chunk Nation Constitution. A removal is actually done at the General Council itself and of necessity cannot comply with the requirements of the Election Code which require notice to the eligible voters, an ability to challenge a voter for being in the wrong district and of course a challenge period after the election. There is no time to do any of the procedures required under the election code in a removal “vote.” Nor is one required, as it is clear that a removal, which like an election requires a vote, is not an election within the meaning of HCN Const. Art. VIII, § 7. Therefore, this Court is not required to expedite this case to meet the requirement of resolving the case within 20 days of filing.
II. Standing
The second issue raised by this case, principally by the defendants, is the allegation that the plaintiffs lack standing to pursue the injunction to stop the election in this case. The defendants recite that none of the plaintiffs reside in Area I whose representative seat is vacant while Clarence Pettibone serves as President pro tern pursuant to HCN Const. Art. IX, § 9(b).
The Court examined carefully the brief testimony of Forrest Whiterrabbit to determine whether or not he was an elector from Area I. The Court concludes that factually he was not. He filed taxes in Colorado in 1999. He testified that he probably would file taxes in Colorado in the year 2000. Although he did have a residence in Hatfield, which is a short distance from Black River Falls in Area I, he never testified that he voted in Tribal elections as an Area I voter. It is also clear that his wife, Kathyleen Lonetree Whiterabbit, is the elected representative from Area V. which is all of the areas outside of Areas I through IV. He testified that he had recently returned from Colorado. Therefore, the preponderance of the evidence is that he is not a resident of Area I and does not have standing to be concerned about who represents Area I.
None of the other plaintiffs claimed to be Area I residents. Thus, the Court must conclude that none of them have the requisite concrete injury in fact that is likely to be redressed by enjoining the special election set for November 18, 2000.
III. Preliminary Injunction
In considering whether or not to grant a preliminary injunction this Court must find that the plaintiff has met the standard first *153 set forth in Joyce Warner et. al v. HCN Election Bd, CV 95-03 et seq (HCN Tr. Ct., July 5 1995) and further articulated in Tracy Thundercloud v. HCN Election Bd., Cv 95-016 (HCN Tr. Ct., Aug. 28, 1995). That standard requires that the plaintiff show that they met four prongs of the preliminary injunction inquiry:
First, they must show that there is no adequate remedy at law; second, they must show that the harm to the plaintiff outweighs the harm in granting the preliminary injunction; third, they must show they are likely to succeed on the merit s; and finally they must show that public policy is in favor of granting the injunction.
A. No Adequate Remedy at Law
The Court finds that if the plaintiff could show standing, they would meet this standard of the preliminary injunction test. The Nation possesses sovereign immunity, which precludes this Court from awarding damages. Moreover, as counsel for the plaintiffs has argued, the lack of a President of their choice robs at least some of the plaintiffs of a non-monetary benefit, which cannot be compensated by money alone. Therefore, the Court concludes that there is no adequate remedy of law.
B. Does the Harm to the Plaintiff outweigh the harm of Granting the Preliminary Injunction?
The harm to the plaintiff in holding the election is rather abstract. None of the plaintiffs are from Area I and therefore are not harmed by being underrepresented while the Vice President and Area I Legislator, Clarence Pettibone, is acting as President pro tem. Area I itself has three representatives and has only lost one Legislator due to the removal of President Lonetree. The harm to Area I, assuming someone from Area I came forward to complain, is minimal. Area I is in some ways in a better political position in the removal scenario by having two Legislators and the head of the Executive branch representing them instead of just three Legislators.
The real harm to the plaintiffs is the possibility that by having a replacement picked by Area I voters, the President pro tem will be precluded from retreating back down to the position of Vice President and Area I Legislator by the election of a replacement. However, this situation was fully contemplated in the design of the Constitution. Section 9 of the Removal Article of the Ho-Chunk Nation Constitution sets forth the terms of office when a Presidential vacancy occurs.
Under Article IX, § 9(b) of the HCN Constitution, if less than twelve months remain before the next General Election, the Vice President shall serve as President pro tempore. If less than twelve months but more than three months remain before the next General Election, the Election Board shall call a Special Election in the appropriate District within thirty days to fill the seat vacated by the Vice President. Upon election of a President at the next General Election, the Vice President “shall reassume his seat on the Legislature for the remainder of his term, if any.” Id. Here, the next General Election will be held in June 2001. There is not quite nine months remaining until the next General Election.
In this case Clarence Pettibone was elected to a four-year term in 1999. At present he is only one year and a quarter into his term. Pursuant to HCN Const. Art. IX, § 9(b) he is required to serve as President pro tempore until the General Election in June 2001 or for another eight months. After that the Constitution is clear. He will return to serve out the remainder of his term, “if any.” Once a replacement President is elected in June *154 2001, the President pro tempore goes back to the position as Legislator.
If President Lonetree wins this legal battle and is returned via this challenge to the actions of removal, Mr. Pettibone would simply return to his seat in the Legislature earlier than contemplated. There is no harm to the person to be elected on November 18, 2000. That person is elected with the firm knowledge that they are a replacement and are in office for a limited term. Even if Clarence Petti-bone were to vie for the position of President in the General Election of June 2001 and win the position only then would a vacancy occur in the Legislative Seat he occupies. In that situation, there would have to be a Special Election to fill that seat.
None of the nine announced candidates presently contending for office can have any reasonable expectation that they are elected permanently. By the design of the Ho-Chunk Nation Constitution, their temporary service as Legislator is terminated by the return of the President pro tempore to his rightful seat in the HCN Legislature. Thus, they know the term of office they hope to be elected to is limited in nature. Such wras the position of Shirley Lonetree elected to fill the vacant seat of Byron Thundercloud in 1997. Her term ended when his term ended. Since his term expired in June 1997, she had to seek election in her own right.
That is the nature of Ho-Chunk electoral office. There is a strong preference for having the people decide who will represent them. Further, there are strong checks on elected officials so they will remain true to the electorate. There is only one situation where a seat will go vacant for any time, and that is for only three months, when there is a vacancy created with less than three months to go before a General Election.
Here the very design of how replacement Legislators are selected makes it clear that there is no harm to the plaintiffs that cannot be undone if Jacob Lonetree succeeds in his bid to retain his office. Thus, the harm of holding the election to the plaintiffs is outweighed by the harm done by halting an election where there are nine candidates and voting is only two days away.
C. The Likelihood of Success on the Merit s
The plaintiffs contend that they have a strong likelihood of success on the merits based on two principal arguments. First that Mr. Lonetree suffered substantive irregularities in the conduct of the General Council itself and second that he suffered procedural irregularities in that he was served Notice of Intent to Remove from a person not authorized to provide such service. The Court agrees with the plaintiffs as to its second argument[2] but not as to its first.
I. The President was given Reasonable Notice and an Opportunity to Defend Himself Against the Charges
The plaintiff asks this Court to examine the truthfulness of the allegations and argued at the hearing that the defendants had to “prove” by some means the allegations against President Lonetree. They admit in the Complaint that President Lonetree was served with the Notice *155 of Intent to Remove on October 3, 2000, well before the ten days required by this Court’s ruling in Coalition for Fair Government II, et al v. Chloris A. Lowe Jr. et. al., CV 96-22 & CV 96-24 Consolidated, 1 Am. Tribal Law 145, 169, 1997 WL 34676286 (HCN Tr. Ct, Jan. 3, 1997) (a removal notice giving less than ten days [notice] is not valid). They agree, and the testimony established that, President Lon-etree was given time to respond to the charges against him. President Lonetree explained for over fifteen minutes why he should not be removed. President Lone-tree included comments that his actions in signing some of the disputed contracts was okayed by the HCN Department of Justice.
The plaintiffs however went further and suggested that the Court established a requirement that the allegations be proven true in some manner and that it was the burden of the proponents of removal to do this. However, the HCN Constitution is silent as to this as a requirement. It positively describes the process as being not a trial similar to a court proceeding but more of due process notice and an opportunity to be heard. It states:
No vote by the General Council to remove the President shall take place before such President has been given reasonable notice of the impending action and has had a reasonable opportunity to be heard.
HCN Const. Art. IX, § 2. While it is true that in its early consideration of a similar case, the alleged removal of three Legislators for malfeasance under a related section of the HCN Constitution, Art. IX § 1, the Court stated that it could examine whether malfeasance was properly alleged, it also agreed that it was up to the General Council to decide whether a Legislator had committed malfeasance so long as it did so within the bounds of the Constitution. Coalition for Fair Government II, et. al. v. Chloris A. Lowe Jr. et. al, CV 96-22 Order re Preliminary Injunction, 1 Am. Tribal Law 145, 155, 158, 1997 WL 34676286 (HCN Tr. Ct., Jan. 3, 1997).[3] The key facts of that case reveal that the notices given to the Legislators had no factual allegations of malfeasance. This violated due process because an accused Legislators had no idea of what they were supposed to defend against. Two of them received no notice whatsoever, the third received three days notice of the attempted removal. The Court held that this was not “reasonable notice” as required under the HCN Constitution.
2. The Court will not Closely Examine the Substance of the Charges of Malfeasance
The later pronouncements of the Court have backed away from a close examination of malfeasance. Coalition far Fair Government II, et. al. v. (Maris A. Lowe Jr. et. al CV 96-22 & CV 96-24 Consolidated, 1 Am. Tribal Law 145, 1997 WL 34676286 (HCN Tr. Ct., Jan. 3, 1997). In the later Order, in the same case as the May 20 Order (Preliminary Injunction), the Court discussed malfeasance primarily in footnotes. See Id. at nn. 10-15. This shows the lack of importance to the overall holding of the case this issue constituted. Even though finding most of the charges revealed mere political disagreement with the Legislators sought to be removed, the Court agreed that two of the charges were sufficient to pass the minimal test for malfeasance, i.e„ lying to constituents and fail- *156 ■ ure to approve Executive Directors without good cause. Id. at n. 15.
The Court invalidated the removal of the three Legislators based primarily on the blatant violations of due process in the attempted recall. No charges were listed in the notices. Two of three Legislators were never served with any notice. One Legislator actually received notice of three days but again the notice had no charges listed in it. The actual charges were not made known prior to the General Council. The Court and the affected Legislators only knew what the alleged charges against them were if they read the packet of information handed out at the General Council and even those packets were not available to all attendees because they ran out.
 The Court reads its past cases as cautioning against a close examination of the substance of the charges against the removal candidate. So long as the charges are capable of fitting the charge of malfeasance, i.e., doing some wrongful act, it is the province of the General Council itself to decide if the charges proffered met each voting member’s understanding of malfeasance. In Coalition II, the Court stated that two of some six or seven claims arguable met this standard. See Coalition for Fair Government II v. Chloris A. Lowe Jr., CV 96-22 and 96-24, p. 27 n. 15. (HCN Tr. Ct. Jan. 3, 2000). This is also in accord with another election case, the recall election of James Greendeer. See James Greendeer v. HCN Election Bd. et., al CV 97-84 (HCN Tr. Ct. July 7, 1997). In that case there were charges that were not true mixed with charges that were partially true or could reasonably be believed to be true. Id. at 13. The Court refused to invalidate the recall election because of the inclusion of some false information. Instructive to this case is that Court’s statement that, “the recall process is essentially a political process where the Courts should be scrupulous to avoid interfering with tribal members right to be represented by those they wish.” Id. at 17. Here we have the removal of a President by the General Council, which is also a political process. This Court is similarly reluctant to examine in depth the substance of the charges of malfeasance against the President. So long as at least one of the charges meets the standard of some sort of bad act or malfeasance the Courts should be reluctant to intervene.
However, the Court cannot allow mere political disagreements between those to seek to remove a President and the President to be sufficient grounds for removal. That is the reason there is a recall process. Removal may stand so long as there is at least an arguable claim that some of the charges against the removal target constitute malfeasance.
3. The Notice of Intent to Remove The President was Served by a Private Ho-Chunk Citizen
There is no dispute that the Notice of Intent, to Remove Jacob Lonetree was served by Gloria Visintin, a private Ho-Chunk citizen. The Notice of Intent to Remove was served on October 3, 2000. This was more than ten days before the October 21, 2000 General Council held in Baraboo at the Ho-Chunk Nation Convention Center. Thus, the Notice was timely, far in excess of the three days given the Legislators stricken in Coalition for Fair Government II.
The plaintiffs claim that they are likely to prevail on the merits of their claim that she had no legal authority to serve such papers citing Coalition for Fair Government, II et. al v. Chloris A. Lowe, Jr., CV 96-22 & CV 96-24, 1 Am. Tribal Law 145, 162-63, 1997 WL 34676286 (HCN Tr. Ct. Jan. 3, 1997). Based on this claim which *157 comes from the language of a case involving the removal of Legislators for “malfeasance” the plaintiffs would prevail. In Coalition II the Court was dealing with an elusive and amorphous group calling itself the General Council Planning Committee, which had no office, no Post Office Box, no phone, no location, whose only known officers either resigned (Don Blackhawk) or were themselves removed (Shawnee Hunt). Mr. Hunt was actually served with the Complaint in that case, but he never appeared because of his alleged removal from the GCPC. No one ever stepped forward to testify as to what authority the GCPC had to serve papers or whether they actually did serve papers.
The testimony about service showed that for at least two Legislators, the GCPC did not serve any papers at all but left notices with no charges with an employee of the Legislature. The Court found this to be defective service of process. The Court went on to find that the General Council Planning Committee had neither inherent authority nor any delegated authority to draw up Notices of Intent to Remove. In the greater context of that case, the language about this exact issue is likely dicta, without binding legal authority. The question remains as to whether the holding on that issue was dicta and second whether it was the proper holding in that case.
Though the Court finds that based on the language in Coalition II the plaintiffs would likely succeed on the merits of this claim, it retains questions as to whether that was a necessary or proper construction of the law, which should be binding in this case. It is clear that Ms. Visintin had no delegated authority to draw up and serve the Notice of Intent to Remove Jacob Lonetree from the Legislature or any other Ho-Chunk institution. However, in later proceedings already scheduled, this Court must determine whether a Ho-Chunk citizen may draw up a Notice of Intent to Remove from office an office holder subject to General Council removal based on the citizen’s own beliefs of what malfeasance is.
D. Is Public Policy in Favor of Granting the Preliminary Injunction
The Court must weigh the public policy of elections expressed in the Ho-Chunk Constitution against the claims of the principal plaintiff, Jacob Lonetree, that his due process rights were violated. As expressed earlier in this opinion the public policy in favor of electoral democracy is very strong and is expressed in the Ho-Chunk Nation Constitution in several sections. Here an election was arranged swiftly and likely with some difficulty within the thirty days required under the HCN Constitution Art. IX § 9(b).
The cost of the election is approximately $10-20,000. It has been planned with sufficient time so that eight candidates filed candidacy papers and one who missed the short deadline is waging a write in campaign. The electorate has been notified and campaigning is well under way. Although there is only one major polling site the electors come from three counties: Jackson, Eau Claire and Clark Counties and are widely disbursed. It is unlikely that immediate publicity would be sufficient to notify all of them that voting had been cancelled. The inconvenience of the public counsels against canceling the election.
Furthermore, there is a strong likelihood that with nine candidates, including two former Area I Legislators, Doug Greengrass and Robert Mudd and one former Tribal Chairman, Gordon Thunder, no one candidate will garner the required 50% + 1 required for election by a majority vote. Although Deb Chase of the Election *158 Board testified that it would take two weeks to a month to hold a run-off, even without a run-off, the likelihood of a ehange in the status quo to the detriment of the plaintiffs in unlikely in the short term. This is because no candidate for office can be sworn in until four Wednesdays after certification of the election results. This is more than thirty days away. This weighs against halting an election already in the advanced stages of preparation; especially if the result is that the winner will only take office after the challenge presented by this case is resolved.
Although this Court has ruled that this case is not an election dispute requiring full disposition and a ruling within twenty days from filing, it is nonetheless a very serious case that requires a quick resolution. This Court will endeavor to handle the case with sufficient speed that it will not cause undue political uncertainty as to who should occupy the Office of the President.
CONCLUSION
The Court finds that the removal of a President by the General Council is not an election requiring a resolution within twenty days of filing. Nonetheless, the Court finds that the plaintiffs have standing to seek resolution of this case. However, upon close examination the plaintiffs likely do not have standing to enjoin the Area I run-off election slated for November 18, 2000 as none of them are affected by that election and ultimate winner takes office dependent on how long the Vice President acts as President pro tempore. The winner is similar to a substitute teacher who leaves when the regular teacher is healthy enough to return to the classroom. Put another way, the winner will have no liberty and property interest in their office sufficient to prevent the President pro tempore from retreating down to his old position. Thus, there is no harm to the plaintiffs by having the winner seated, because if the plaintiffs prevail President Lonetree can be restored to office.
The Court finds against the plaintiffs request for a preliminary injunction because they do not meet the second and fourth prongs of the four-part injunction test. The harm to the plaintiffs is minimal in that they have no standing to contest the November 18, 2000 election and the harm to the Nation in stopping an election, which has been in the works for two weeks, is high. Although the plaintiffs appear likely to succeed on at least one claim on the merit s, the doctrine it rests on should be closely examined to determine whether it should continue to be followed. The plaintiffs fail the fourth prong of the injunction test because undoing elections is against the strong policy of the Nation in having officials elected promptly. Candidates for office are campaigning, large numbers of the electorate are aware of the election and both would be inconvenienced by a cancellation at this late date. Moreover, even if a person were elected they would not be seated for another four weeks, which should be sufficient time to litigate the remainder of this case. The remainder of this case is set for briefing and can be concluded swiftly.
Based on the forgoing reasons, the request for a preliminary injunction of the Special Area I Legislative Seat Election is denied.
Any party may appeal a final judgment of the Court to the HCN Supreme Court. A judgment becomes final once signed by the presiding judge and filed with the Clerk of Court. HCN R. Civ. P. 57; See also Id., Rule 61. The parties must abide by the procedures set forth in the Ho-Chunk Nation Rules of Appellate Procedure.

. The Court had determined in an earlier case that certain issues resulting from a General Council, such as whether or not there was a quorum, whether the legislators had received proper notice of the allegations of malfeasance for which removal was sought, and whether the legislators had had an opportunity to defend themselves against the allegations in Coalition for Fair Government H v. Chloris A. Lowe Jr., as Chairperson of April 27, 1996 General Council and Kathleen LoneTree Whi-terabbit as Secretary of the April 27, 1996 General Council, and will therefore not discuss the issue here as the primary issue at hand is whether notice was proper. See Order (Re: Preliminary injunction), CV 96-22 (HCN Tr. Ct, May 20, 1996) at 12-14.

. The plaintiff's point to the specific language in a case clearly analogous to this, where the Court noted that the parties serving the persons sought to be removed had no appointed or delegated authority to draw up or provide service of removal. See Coalition for Fair Government. II et. al v. Chloris A. Lowe Jr. et. al, CV 96-22 & 96-24, 1 Am. Tribal Law 145, 162-63, 1997 WL 34676286 (HCN Tr. Ct. Jan 3, 1997)

. The Court did not define what malfeasance was other than to cite to its general definition. Id. at 17, 1 Am. Tribal Law at 158.